RANDOLPH, Justice,
for the Court:
¶ 1. The “Child Custody, Support and Property Settlement Agreement” (“Agreement”) between A.M.L. and J.W.L., incorporated into their February 2002 “Final Judgment of Divorce,” provided that they would share “joint legal custody” of their four daughters, with A.M.L. having “primary physical custody” and J.W.L. having frequent visitation. The Agreement also *1005 provided for, inter alia, child support, medical expenses and reimbursement, college expenses, and life insurance naming the children as beneficiaries. In the following years, J.W.L. became effectively estranged from his two oldest daughters, and ceased overnight and weekend visitation with both. In 2008, A.M.L. filed a “Petition for Modification and/or Clarification of Final Judgment of Divorce” (“Petition”) and J.W.L. responded with a “Counterclaim for Modification of Custody and Other Relief’ (“Counterclaim”). A.M.L.’s Petition requested full “legal and physical custody” of the children, an increase in child support, clarification of several Agreement provisions, contempt orders against J.W.L. for his alleged failure to comply with various Agreement provisions, and attorney fees. J.W.L.’s Counterclaim sought “full legal and physical custody” of their two youngest daughters, with attending modifications of Agreement provisions regarding child support, medical expenses, and college expenses.
¶ 2. Following trial, the Chancery Court of Madison County, Mississippi, entered its “Opinion and Judgment on Petition for Modification and/or Clarification of Final Judgment of Divorce” (“Opinion and Judgment”). Regarding child custody, the chancellor found a “material change in circumstances ... which warrants modification of custody and the transfer of primary physical and legal custody of [the three youngest children] to [J.W.L.,] based upon conduct of the children which was attributed to A.M.L. “impos[ing] little or no discipline.”[1] Yet the chancery court delayed ordering custody modification, holding such ruling in abeyance, “subject to the parties adhering to” several court-imposed conditions. Thus, A.M.L. retained physical custody of the children. The “Opinion and Judgment” also modified J.W.L.’s child-support and college-expense obligations, and denied A.M.L.’s request for attorney fees. Following the denial of post-trial motions filed by A.M.L. and J.W.L.[2] with respect to the rulings now challenged on appeal,[3] A.M.L. filed “Notice of Appeal” and J.W.L. filed “Notice of Cross-Appeal.”
FACTS
¶ 3. A.M.L. and J.W.L. were married in 1985. During the course of their marriage, the couple had four daughters: A.B.[4] (born September 6,1989), C.D. (born June 19, 1991), W.X. (born August 12, 1994), and Y.Z. (born September 16, 1996).[5] On February 6, 2002, a “Final Judgment of Divorce—Irreconcilable Differences” between A.M.L. and J.W.L. was entered by the chancery court.
¶4. The Agreement, incorporated into the “Final Judgment of Divorce,” provided that A.M.L. and J.W.L. would share “joint legal custody,” that A.M.L. would have *1006 “primary physical custody,” and that J.W.L. would have frequent visitation. The Agreement further stated that J.W.L. would pay $2,400 per month in child support. Regarding medical expenses, the Agreement provided that J.W.L. “shall pay all of the non-covered medical and dental expenses provided that [A.M.L.] shall not incur any expense on behalf of the children in excess of $200 without prior consultation with [J.W.L.], except in cases of emergency where prior notice is not possible.” (Emphasis added.) The Agreement added that any required reimbursement for non-covered medical and dental expenses “shall” occur “within thirty (30) days of receipt of ... proof of payment.” As to college expenses, the Agreement stated that:
[t]he parties agree that should any child have the aptitude and desire to attend college, the parties agree that they should provide at least a four year college education for their children, subject to their respective financial abilities at the time. They agree to attempt to reach Agreed Orders for the provision of such education for their children in the future and if they are unable to agree, then such issues may be presented to the [c]ourt by either party for adjudication. In the meantime, [J.W.L,] agrees to purchase two (2) MPACTs or comparable prepaid college plans on or before December 31, 2002 which the parties agree may be utilized to cover tuition. All EE Savings Bonds owned by the parties or their children at the time of this Agreement shall be applied to the children’s college education.
The Agreement also provided that J.W.L. “will maintain a life insurance policy in the amount of $1,000,000 upon himself, with the minor children as beneficiaries.... Each party shall provide written proof of such insurance coverage within thirty (30) days of the written demand by the other party.” (Emphasis added.)
¶ 5. Following the divorce, the parties agree that their oldest child, A.B., began having disciplinary problems and declining grades in school. According to A.B., the divorce made her “really upset” and she “became really rebellious about everything[,] ... to anyone.” In her estimation, there was “[p]robably not” anything her parents could have done to prevent her conduct. According to J.W.L., he responded by refusing to allow A.B. to “come over and spend the night with us[6] on weekend visitation[,]” but that she was invited to come for visitation on Monday afternoons “[i]f she would ... behave in a civil fashion ....”[7]
¶ 6. Soon thereafter, in 2004, A.B. (then fourteen years old) began dating a twenty-one-year-old,[8] and would sneak out of A.M.L.’s home in the middle of the night on several occasions. A.B. testified that A.M.L. responded by “grounding me from friends, from the phone[,] anything that I was interested in to try to prevent me from doing stuff....”[9]
*1007 ¶ 7. Subsequently, a serious allegation arose after A.B. reported to a friend that she had been raped by a boy at church. According to A.B., that friend then “told her mom and her mom told [A.M.L.] and the story got mixed up as far as each time it went down the line.”[10] Ultimately, C.D. (the second oldest daughter) overheard A.M.L. discussing the incident, told one of her friends, and, according to A.M.L., “this girl understood [C.D.] to be saying that she wondered if [J.W.L.] had sexually molested A.B.... This girl ... shared [that information] with her parents[11] who then went forward and had her talk to [the Department of Human Services (“DHS”) ].” Following investigation, DHS found no evidence of physical or sexual abuse by J.W.L.[12]
¶ 8. But because of the DHS investigation, J.W.L. also restricted his visitation with C.D. According to J.W.L., “I ... said I would be happy to have her visit with me on the weekday visitation but not have her come over and spend the night.... ” While C.D. explained that the DHS investigation was precipitated by a misunderstanding, J.W.L. testified that he “couldn’t afford” to visit with her further, “from the standpoint that if she made ... up a story about me raping someone and then repeated it again later then potentially I could lose my employment and go to jail_” J.W.L. opined that the alleged “misunderstanding” was, in fact, “sparked by, formulated by, planned by [A.M.L.], to harm me in a relationship with the woman I was engaged with and married and potentially also in the medical community and otherwise.” According to J.W.L., “the timing of my engagement ... and this investigation sparked by someone overhearing comments and reporting them was likely not a coincidence but rather a plan to have the engagement destroyed or potentially my professional reputation as well.”[13]
¶ 9. During eleventh grade, A.B. continued to have disciplinary and academic problems and became pregnant.[14] During A.B.’s pregnancy, J.W.L. did not visit with her on a regular basis.
¶ 10. As to the two younger daughters (W.X. and Y.Z.), both parties testified that J.W.L. has had positive father-daughter relationships with them. While W.X. had some academic and disciplinary problems *1008 during seventh grade,[15] she had made improvements by eighth grade.[16] As to Y.Z., both parties testified that, through 2008, she was a bright, athletic, and well-adjusted child.[17]

AM.L.’s Petition and J.W.L.’s Counterclaim

¶ 11. On January 30, 2008, A.M.L. filed her Petition, which requested, inter alia, full “legal and physical custody” of the children,[18] an increase in child support,[19] a modification of the Agreement provision which required her to consult with J.W.L. “prior to incurring expenses on behalf of the children in excess of $200[,]”[20] and a modification of the Agreement to specify the college expenses to be paid by J.W.L.[21] A.M.L. later amended the Petition to request additionally that J.W.L. be held in “willful and contumacious contempt” for failing to comply with various Agreement provisions.[22] Finally, A.M.L. sought to “require [J.W.L.] to pay the attorney fees incurred by [her] in this action as [she] does not have the financial ability to pay her attorney fees.”
¶ 12. On May 22, 2008, J.W.L. filed his Answer and Counterclaim, which denied that A.M.L. was entitled to any of her requested relief. J.W.L. further sought “full legal and physical custody” of W.X. *1009 and Y.Z.,[23] an attending modification of child-support responsibilities for those two children,[24] and a modification of the Agreement to provide for the equal division of noncovered medical and dental expenses. J.W.L. later amended the Counterclaim to request additionally that A.B. be deemed emancipated,[25] and for an attending “reduction in child support and reallocation of higher education funds.”

Trial and GAL Recommendation

¶ 13. On June 24, 2009, trial commenced in the chancery court.[26] After the GAL’s “Interim Report” was introduced, the GAL provided testimony. Regarding the DHS investigation, the GAL testified that “I believe that anything [C.D.] said was not a malicious attack on [J.W.L.].... I think she’s truly sorry it happened.... I don’t think there was any great conspiracy here.” According to the GAL, the “estrangement” of A.B. and C.D. from J.W.L. did not “stem from ... any attempt by [A.M.L.] to alienate these two girls from [J.W.L.].”
¶ 14. As to child discipline, the GAL found that A.M.L. and J.W.L. utilized “two diametrically-opposed methods[,]” i.e., J.W.L. is “very strict and authoritarian[,]” while A.M.L. “appears to be more concerned with being their friend.” According to the GAL, “[njeither one of them is wrong, they just don’t go together well and these children are caught in the middle. And it’s probably exacerbated by the acrimonious divorce.” But the GAL added that A.M.L. was “not supportive” of J.W.L.’s disciplinary efforts, tended to “over defend these children!,]” and that “her continuing to enable the children to avoid the consequences of their actions is a recipe for disaster.” With that said, the GAL concluded, “I don’t think there has been any material change in circumstances as to the two younger children that would warrant a [custody] change.”[27] (Emphasis added.)
¶ 15. Ultimately, the GAL recommended:
*1010 (1) to temporarily leave custody as is,
(2) to increase ... the amount of time [J.W.L.] spends with the children and the input he has in their lives[,][28] (8) combined with [c]ourt-ordered counseling — perhaps one psychologist to work on the parents’ co-parenting skills and another to work with the girls on their individual situations.

“Opinion and Judgment ”

¶ 16. Three-and-one-half months later, on October 15, 2009, the chancery court entered its “Opinion and Judgment.” As to modification of child custody, the chancellor found, in pertinent part, that:
[t]he testimony reveals there ha[s] been a material change in circumstances since the rendition of the Final Judgment of Divorce.... Since the divorce, [A.B.] has had two (2) children born out of wedlock. She has moved out of the home of [A.M.L.] to live with her boyfriend.... [A.B.] and [C.D.] have behaved in such a manner that [J.W.L.] fears being alone with them.... [W.X.]
... has been caught shoplifting, suspended from school for having cigarettes, slapped [A.M.L.], and called her [a“bitch”].[29]
[[Image here]]
[A.M.L.] has not actively engaged in an effort to alienate the two oldest children from [J.W.L.] by encouraging them to falsely accuse [J.W.L.] of rape.[30] What [the GAL] did find, however, is that the two (2) parties have very different parenting styles. [J.W.L.] is a rather stern disciplinarian and [A.M.L.] imposes little or no discipline.
[[Image here]]
The decision for the [c]ourt as to whether a material change in circumstances has occurred sufficient to warrant a modification is difficult.... [A.M.L.] was granted custody seven (7) years ago. Since that time, the oldest girl has gone down a path of total destruction, ie., at 19 years of age, she has had two children bom out of wedlock, has dated much older men, has lived with one man, ... and her father is afraid to be alone with her.
The second child, [C.D.] started a lie that, in part, is responsible for the alienation of [A.B.] and [J.W.L.]. She has engaged in acts ... that have caused [J.W.L.] to be fearful of being alone with her as well. The third child, [W.X.]; ... had begun to perform poorly in school, she was caught shoplifting, suspended from school, slapped [A.M.L.], and called her a [“bitch”]. At the conclusion of the hearing, according to all testimony, [Y.Z.], the youngest was doing well. However, ... [Y.Z.] is now refusing to visit with [J.W.L.]. It appears that [J.W.L.] chastised [Y.Z.] for misbehaving while visiting with her paternal grandmother.
[[Image here]]
From all indication, the minor children of the parties, for the most part, are children in need of supervision.... They need adults who will do the hard job, and be parents.... This does not occur *1011 in a situation where children have no boundaries and do not respect authority. This Court shares the concerns of [J.W.L.] as to the ability of [A.M.L.] to set boundaries for her children and expect adherence thereto.
[[Image here]]
In keeping with the recommendation of the GAL, the [cjourt will allow [A.M.L.] to retain physical custody of the minor children of the parties subject to the following conditions: (1) [W.X.], [Y.Z.], and [C.D.] are to maintain a B average in school; (2) neither of the children is to strike their parents; (3) [A.M.L.] shall support and enforce the disciplinary actions [J.W.L.] may impose on the minor children; and (4) [J.W.L.], [A.M.L.], and all of the minor children are to attend family counseling.
[[Image here]]
The [e]ourt hereby finds that a material change in circumstances has occurred which warrants modification of custody and the transfer of primary physical and legal custody of [W.X.], [Y.Z.], and [C.D.] to [J.W.L.].[31] However, the [c]ourt will hold in abeyance its decision ... subject to the parties adhering to the conditions set forth above. Upon the violation of any one of the conditions above, custody of [W-X-], [Y.Z.], and [C.D.] will be immediately transferred to [J.W.L.], and his obligation to pay child support to [A.M.L.] for the benefit of the minor children shall immediately terminate.
(Emphasis added.)
¶ 17. Regarding modification of child support, the chancellor determined that, since the “Final Judgment of Divorce,” there had been: an increase in the needs of the children and, therefore, an attending increase in their expenses; inflation; and a substantial increase in J.W.L.’s income, such that, “relatively speaking, he is in a better financial condition than [A.M.L.].” Accordingly, the chancellor ordered “that child support payments for the support and maintenance of [W.X.], [Y.Z.], and [C.D.] be ... increased” to $3,600 per month. As to [A.B.], the chancellor found that, while she had not been emancipated, her behavior toward J.W.L. “terminates” his obligation to pay child support for her benefit, “retroactive to the date of his counter-complaint for modification.” (Emphasis added.)
¶ 18. Regarding college expenses, the chancellor determined that A.B.’s and C.D.’s “behavior toward, and relationship with[,]” J.W.L. failed to satisfy “the standard set forth in” Hambrick v. Prestwood, 382 So.2d 474 (Miss.1980). As to A.B., the chancellor found that her actions had “forfeit[ed]” J.W.L.’s “obligation ... to pay for [her] educational expenses ... save for the funds that are in the MPACT on her account.” With respect to C.D., the chancellor determined that, because J.W.L. “has not requested to be relieved of his obligation to pay for” her college expenses, then “the MPACT and EE Savings bonds shall be reallocated to pay the college expenses of [her] and the other minor children.” A ruling on college expenses for W.X. and Y.Z. was held in abeyance, and the chancellor ruled that “[a]ll other aspects of the college expenses as set out in the original [Agreement] shall remain in full force and effect.”
¶ 19. Regarding attorney fees, the chancellor held that, because A.M.L. had “failed to timely introduce any evidence ... or establish her inability to pay her *1012 own attorney’s fees at the trial on the merits, ... her request, for attorney’s fees, is denied.”

Post-trial motions

¶ 20. Thereafter, A.M.L. filed her “Motion. to Amend Judgment,” as well as another “Petition for Citation of Contempt and Other Relief’ which pertained to, inter alia, unreimbursed medical expenses. J.W.L. filed a “Motion to Enforce Transfer of Custody, Terminate Child Support and For Other Relief,” based, in part, upon W.X.’s alleged failure to satisfy the court-imposed condition of maintaining a “B” average.
¶ 21. Following hearings, the chancery court entered its “Order on Motion to Amend and/or Clarify Findings and Judgment, or, in the Alternative, Grant a New Trial.” Significantly, the chancellor reaffirmed the rulings that are challenged on appeal.[32] Additionally, the chancellor addressed whether J.W.L. had acted in willful contempt regarding unreimbursed medical expenses and his alleged failure to provide “written proof’ of life-insurance coverage. On unreimbursed medical expenses, the chancellor concluded that:
the delays seem to have been, in most cases, due to (1) conflicts as to whether [A.M.L.] had consulted with [J.W.L.] before incurring expenses more than $200.00, (2) proper interpretation of the billing statement and insurance payments, and (3) whether the medical expenses in question had already been paid by [J.W.L.], For [these] reasons, the [c]ourt finds [J.W.L.] was not in contempt of the Judgment of this [c]ourt.
(Emphasis added.) As to “written proof’ of life-insurance coverage, the chancellor held that, based upon the testimony offered and the evidence presented, J.W.L. “has maintained life insurance throughout all these proceedings and provided proof of the same to [A.M.L.]. Therefore, he was not in contempt as to his requirement to maintain and provide proof of life insurance.” (Emphasis added.) Subsequently, A.M.L. filed “Notice of Appeal” and J.W.L. filed “Notice of Cross-Appeal.”
ISSUES
¶ 22. This Court will consider:
(1) Whether the chancellor erred in modifying child custody, and then holding that ruling in abeyance.[33]
(2) Whether the chancellor’s rulings regarding child support were in error.
(3) Whether the chancellor’s rulings regarding medical expenses were in error.
(4) Whether the chancellor’s rulings regarding college expenses were in error.
(5) Whether the chancellor’s ruling regarding life insurance was in error.
(6) Whether the chancellor’s rulings regarding attorney fees were in error.
ANALYSIS
¶ 23. This Court has stated that:
[t]he standard of review in child custody cases is quite limited. A chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this Court to reverse. Mabus *1013 v. Mabus, 847 So.2d 815, 818 (Miss. 2003).
“[F]indings of fact made by a chancellor may not be set aside or disturbed upon appeal if they are supported by substantial, credible evidence.” Marascalco v. Mamscalco, 445 So.2d 1380, 1382 (Miss.1984)....
Johnson v. Gray, 859 So.2d 1006, 1012 (Miss.2003).
I. Child Custody
¶ 24. “In the ordinary modification proceeding, the non-custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree;[34] (2) that this change adversely affects the child’s welfare; and (3) that the child’s best interest mandates a change of custody.”[35] Ma-bus, 847 So.2d at 818 (citing Bubac v. Boston, 600 So.2d 951, 955 (Miss.1992)). In making a custody-modification determination, “the ‘totality of the circumstances’ must be considered.” Ash v. Ash, 622 So.2d 1264, 1266 (Miss.1993) (quoting Tucker, 453 So.2d at 1297).
¶ 25. Both A.M.L. and J.W.L. challenge different aspects of the chancellor’s ruling that held in abeyance the “modification of custody and the transfer of primary physical and legal custody of [W.X.], [Y.Z.], and [C.D.] to [J.W.L.,] with A.M.L. retaining physical custody of those children subject to adherence to the court-imposed conditions. A.M.L. contends that custody modification was unwarranted because the evidence presented did not support finding a “material change in circumstances” in the custodial home “that adversely affected the children.”[36] J.W.L. argues that holding the custody-modification ruling in abeyance was “clear error and an abuse of discretion.”
¶ 26. While this Court finds that the chancellor applied an “erroneous legal standard” in holding the custody modification in abeyance after concluding that it was warranted, this Court further concludes that the net effect of A.M.L. retaining physical custody is the proper result. Johnson, 859 So.2d at 1012. Specifically, because the chancellor’s finding of a “material change in circumstances” was not supported by “substantial, credible evidence,” as well as the absence of an Al-bright analysis until the “Order on Motion to Amend and/or Clarify Findings and Judgment, or, in the Alternative, Grant a New Trial,” child custody should not have been modified. Id. Accordingly, for the reasons outlined in Section I(l)(b) infra, this Court concludes that “primary physical custody” should remain with A.M.L.

*1014
(1) Material change in circumstances

(a) Alienation

¶ 27. The chancellor found that A.M.L. “has not actively engaged in an effort to alienate the two oldest children from [J.W.L.] by encouraging them to falsely accuse [J.W.L.] of rape.” According to the chancellor, “[i]f any alienation occurred, it resulted from [J.W.L.] refusing to visit with his two older daughters .... ” The chancellor’s findings on alienation were consistent with the GAL’s recommendation that the DHS investigation did not result from “any great con-spiracyf,]” and that the “estrangement” of A.B. and C.D. from J.W.L. was not related to actions by A.M.L.
¶ 28. J.W.L. argues that the chancellor “erred in not finding [A.M.L.] ’s conduct alienated the affections of the children for their father.” He contends that the false allegations which precipitated the DHS investigation were attributable to A.M.L. and, therefore, supported custody modification. A.M.L. responds that J.W.L. has failed to identify evidence reflecting that she conspiratorially influenced the children to make any false allegations, and that “[n]either the GAL nor the [c]ourt found any evidence of alienation by [her].” According to A.M.L., “the evidence shows that [J.W.L.] lost his relationship with A.B. and C.D. because he chose to stop visiting with them.... ”
¶ 29. Addressing alienation, the Mississippi Court of Appeals has stated that, only in “extraordinary cases,” will “the interference with a non-custodial parent’s visitation ris[e] to the level where it constitutes a material change in circumstances.” Ellis v. Ellis, 952 So.2d 982, 990 (Miss.Ct.App.2006) (“Ellis II”) (quoting Ash, 622 So.2d at 1266) (emphasis added). In one such “extraordinary eas[e],” that court affirmed a custody-modification order where the custodial parent had engaged in “continued and obstinate interference” with the noncustodial parent’s visitation and had made “unsubstantiated” allegations of abuse by the noncustodial parent, including “deliberate coaching of the child” regarding such allegations, leading to a DHS investigation. Potter v. Greene, 973 So.2d 291, 293 (Miss.Ct.App.2008).
¶ 30. This Court concludes that the chancellor was not “manifestly wrong” or “clearly erroneous” in finding that A.M.L. had not “actively engaged” in alienation efforts. Johnson, 859 So.2d at 1012. The record provides support for a conclusion that the DHS investigation resulted from a misunderstanding. Additionally, J.W.L. made the unilateral decision to cease overnight and weekend visitation with A.B. and C.D. Finally, A.B. testified that A.M.L. “always talks good about [J.W.L.] whenever we talk[,]” and that A.M.L. had instructed her daughters that “[w]e didn’t have to like what [J.W.L.’s] decisions were but we had to respect him.” As the case sub judice does not present an “extraordinary” case of clear alienation efforts, this issue is without merit. Ellis II, 952 So.2d at 990 (quoting Ash, 622 So.2d at 1266).

(b) Discipline issues

¶ 31. The chancellor’s finding of a “material change in circumstances” was based largely upon the conduct of the children, which was attributed to A.M.L.’s purported “parenting styl[e]” of “imposing] little or no discipline,” and failing to support the disciplinary measures imposed by J.W.L.
¶ 32. A.M.L. contends that the chancellor’s finding “that there has been a material change in circumstances to warrant a change in physical custody is not supported by substantial, credible evidence.” According to A.M.L., while the chancellor “made numerous findings of the children’s *1015 behavioral problems, ... there is no evidence that these problems are attributable to [A.M.L.] or exacerbated by circumstances in her home.” In A.M.L.’s estimation, she “should not be punished because [A.B.] and [W.X.] made some poor choices and [C.D.] made a comment ... that was misinterpreted and resulted in a DHS investigation of [J.W.L.]. Neither should [J.W.L.] be rewarded with physical custody of [W.X.] and [Y.Z.] after abandoning [A.B.] and [CD.].”
¶ 33. “[A] material change in circumstances ... requires proof of a serious material change in the home of the custodial parent.” Deborah H. Bell, Bell on Mississippi Family Law § 12.11(5)(a) (2d ed.2011) (emphasis added). There is no dispute that two of the children — A.B., in particular, and W.X., to a much lesser degree — had significant disciplinary and academic issues following the divorce. J.W.L. attributed these issues to the lack of a “consistent supportive discipline pattern” from A.M.L. However, the record provides ample evidence of A.M.L. disciplining her children. As A.B. testified, A.M.L. has had curfew rules, rules about “not fighting with sisters[,]” and rules on “keeping good grades up or else you get grounded[,]”[37] for as long as she could recall. According to A.M.L., the children “have to follow the rules at [J.W.L.’s] house. They have to follow the rules at my house.” Thus, while the methods of child discipline used by A.M.L. and J.W.L. were different, there is a dearth of “substantial, credible evidence” to support the chancellor’s finding that A.M.L. “imposes little or no discipline.” Johnson, 859 So.2d at 1012.
¶ 34. More fundamentally, this Court finds the purported link between A.M.L.’s disciplinary methods and the behavior of the children to be tenuous for purposes of a “material-change-in-circumstances” analysis. Under the facts presented, this Court fails to identify the “serious material change” which has occurred “in the home of the custodial parent.” Bell on Mississippi Family Law at § 12.11(5)(a). A.B. testified that her conduct was largely in rebellion over her anger about the divorce, and that there was “[p]robably not” anything her parents could have done to prevent it. As to C.D., no evidence was presented that she has had any disciplinary issues with her parents, and even J.W.L. testified that her grades “have been excellent.” The DHS investigation, while undeniably unfortunate, seems to have resulted from a misunderstanding by C.D. at twelve years of age, not a malicious “lie.” Regarding W.X., her limited disciplinary issues seem to be little more than, in the GAL’s words, a child “in her teenage years ... pushing hard against the boundaries.” Moreover, her academic performance had been improving. Finally, apart from the incident noted in footnote 17 supra, Y.Z. was described as an obedient and bright child. The chancellor’s “material-change-in-circumstances” analysis erroneously attributes all poor conduct of the children to A.M.L.’s parenting style, fails to give her any credit for their positive conduct, and disregards that, since 2004, J.W.L. has chosen effectively to withdraw himself from the lives of A.B. and C.D.
¶ 35. Accordingly, this Court concludes that the chancellor’s finding of a “material change in circumstances” was “manifestly wrong, clearly erroneous,” and unsupported by “substantial, credible evidence.” Johnson, 859 So.2d at 1012. Here, there has not been “a serious material change in *1016 the home of the custodial parent.” Bell on Mississippi Family Law at § 12.11(5)(a). In the absence of a “material change in circumstances,” there is no basis for a custody modification.

Conclusion

¶ 36. Based upon the analysis in Section I(l)(b) supra, in the absence of a “material change in circumstances” in the custodial home, the adverse effect and best-interest (Albright) factors need not be considered.[38] The children remaining with A.M.L., with the parties continuing to share “joint legal custody” of the minor children, is the proper result.
¶ 37. As to the court-imposed conditions, this Court finds that, while they are not appropriate for holding the custody modification in abeyance (as there is no custody modification to be held in abeyance), several are otherwise proper. “A court may impose restrictions or conditions on either parent to prevent harm to a child.” Bell on Mississippi Family Law at § 12.05. This Court concludes that the conditions regarding family counseling and A.M.L. supporting J.W.L.’s discipline are properly directed to the parents toward the end of “preventing] harm to a child.” Id. The failure of either parent to abide by such conditions would provide a legitimate basis for contempt proceedings.[39]
II. Child Support
¶ 38. “[T]he process of weighing evidence and arriving at an award of child support is essentially an exercise in fact-finding, which customarily significantly restrains this Court’s review.” Clausel v. Clausel, 714 So.2d 265, 266-67 (Miss.1998) (quoting Gillespie v. Gillespie, 594 So.2d 620, 622 (Miss.1992)). See also Tedford v. Dempsey, 437 So.2d 410, 417 (Miss.1983) (“In child support modification proceedings, as elsewhere, the chancellor is accorded substantial discretion and is charged to consider all relevant facts and equities, to the end that a decree serving the best interests of the children may be fashioned.... If we find substantial evidence supporting the chancellor’s fact findings, they are beyond our power to disturb.”).
¶ 39. The parties do not contest the chancellor’s decision to increase “child support payments for the support and maintenance” of C.D., W.X., and Y.Z. to $3,600 per month. But A.M.L. argues (1) that the chancellor “applied an erroneous legal standard” in terminating J.W.L.’s child-support obligation for A.B. “retroactive to the date of his counter-complaint for modification[,]”[40] and (2) that the chancellor abused her discretion by refusing “to retroactively increase the child support that [A.M.L.] is receiving for the three other minor children.”

(1) Retroactive termination of J.W.L.’s child-support obligation for A.B.

¶ 40. According to A.M.L., “[c]hild support payments vest when due,” and retro *1017 active termination is an impermissible form of “downward retroactive modification .... ” See Howard v. Howard, 968 So.2d 961, 977 (Miss.Ct.App.2007); Miss. Code Ann. § 48-19-84(4) (Rev.2009). J.W.L. responds that the chancery court did not order a “downward retroactive modification,” because “[t]he [c]ourt did not modify the sums downward.” Rather, J.W.L. contends that “[t]he chancellor terminated the support [for A.B.] based upon the timing of [her] conduct ... and seeking relief of the [c]ourt by the parties.”
¶41. Mississippi Code Section 43-19-34(4) provides, in pertinent part, that “[a]ny order for the support of minor children, whether entered through the judicial system or through an expedited process, shall not be subject to a downward retroactive modification.” Miss.Code Ann. § 43-19-34(4) (Rev.2009) (emphasis added). Child support payments:
vest in the child as they become due. [41] Tanner v. Roland, 598 So.2d 783, 786 (Miss.1992). Each payment that becomes due and is unpaid becomes a judgment against the supporting parent. Id. A court cannot modify or forgive vested child support obligations. Id. Accordingly, when a payor moves for downward modification of child support, the payments due continue to vest during the pendency of the motion. Cumberland v. Cumberland, 564 So.2d 839, 847 (Miss.1990). Any modification granted will take effect on the date of the judgment granting the modification,[42] Id.
Howard, 968 So.2d at 977 (emphasis added).
¶ 42. J.W.L.’s child-support obligations for A.B. “continue[d] to vest during the pendency of’ his Counterclaim. Id. The modification which was granted, i.e., termination of that child-support obligation, took effect “on the date of the judgment granting the modification.” Id. See also Roberts, 805 So.2d at 654. Accordingly, the chancellor applied “an erroneous legal standard” in terminating J.W.L.’s child-support obligation for A.B. “retroactive to the date of his counter-complaint for modification.” Johnson, 859 So.2d at 1012. That ruling should have been effective from October 15, 2009, the date of the “Opinion and Judgment.”

(2) No retroactive increase in J.W.L.’s child-support obligation for C.D., W.X., and Y.Z.

¶ 43. A.M.L. maintains that J.W.L.’s increased child-support obligation for C.D., W.X., and Y.Z. “should be applied retroactively to January 30, 2008[,]” the date she filed her Petition. According to A.M.L.:
[b]ecause the increase in the girls’ expenses and [J.W.L.] ’s increase in income existed on January 30, 2008 when [A.M.L.] initially petitioned the [c]ourt for an increase in child support, a retroactive increase in child support would not serve as a windfall to [A.M.L.] but would simply provide adequate funds to meet the children’s needs beginning January 30, 2008.
J.W.L. responds that “[t]here was no abuse of discretion nor was an erroneous legal standard used in determining that *1018 the ordered increase would not be retroactive.”
¶ 44. Mississippi Code Section 43-19-34(4) provides, in pertinent part, that “[a]n upward retroactive modification may be ordered back to the date of. the event justifying the upward modification.” Miss. Code Ann. § 43-19-34(4) (Rev.2009) (emphasis added). See also Riddick v. Ridick, 906 So.2d 813, 819 (Miss.Ct.App.2004) (quoting Lawrence v. Lawrence, 574 So.2d 1376, 1384 (Miss.1991)) (“We find that the better rule is to allow modification amounting to an increase in child support as of the date of the petition to modify or thereafter, within the sound discretion of the trial court.”). As an “upward retroactive modification” is permissible, but not mandatory, this Court cannot conclude that the chancellor’s ruling was “manifestly wrong, clearly erroneous,” or involved application of “an erroneous legal standard.” Miss. Code Ann. § 43-19-34(4) (Rev.2009); Johnson, 859 So.2d at 1012. Accordingly, this issue is without merit.
III. Medical Expenses

(1) Noncovered medical and dental expenses

¶ 45. The Agreement stated that J.W.L. “shall pay all of the non-covered medical and dental expenses provided that [A.M.L.] shall not incur any expense on behalf of the children in excess of $200 without prior consultation with [J.W.L.], except in cases of emergency where prior notice is not possible.” (Emphasis added.) Both parties have acknowledged that agreeing to medical expenses has been problematic. As to the subject provision, J.W.L. has maintained that the phrase “prior consultation with” meant agreement on the expense being incurred, while A.M.L. agreed only that “it’s reasonable for me to let [J.W.L.] know when we’ve got expenses coming....”
¶ 46. A.M.L. argues that the parties’ repeated failure to agree on the meaning of the noncovered-medieal-and-dental-ex-penses provision is compromising the medical care received by the children, such that the chancellor abused her discretion and committed manifest error by failing to modify this provision. J.W.L. responds that A.M.L. “offers no authority” for the purported error, and adds that his interpretation is sound because with his “training and background, he has a unique ability and knowledge to provide medical assistance.”
¶ 47. This Court cannot conclude that the chancellor was “manifestly wrong, clearly erroneous, or applfied] an erroneous legal standard” in leaving the noneov-ered-medical-and-dental-expenses provision unaltered. Johnson, 859 So.2d at 1012. However, as (1) the meaning of this provision has been a principal basis of dispute between the parties,[43] (2) the Agreement elsewhere provides that “each parent shall share the decision-making rights, responsibilities and authority relating to the health ... and welfare of a child with the other parent[,]” and (3) the fact that this Court is reversing on other grounds, a clarification of the meaning of the phrase “prior consultation with” is advisable on remand.

(2) Reimbursement

¶ 48. The Agreement provided that any required reimbursement for noncovered medical and dental expenses “shall” occur “within thirty (30) days of receipt of ... proof of payment.” According to A.M.L., *1019 “over half the time [J.W.L.] does not reimburse me within 30 days.... Sometimes I can send him multiple requests.... I just don’t hear from him.”[44] Moreover, J.W.L. acknowledged that “[t]he delays that have taken place have been a problem.” But according to J.W.L., the reimbursement requests have “come at irregular intervals” [45] and “[w]hen I get her bills ..., to then back check the insurance, make sure it’s appropriate, make sure that the billing was done and has been paid out, is much harder to me than doing the medicine itself. The insurance is at times not understandable.” J.W.L. testified that “I would simply like to be able to know what bill is true and accurate if I’m going to pay it.”
¶ 49. The chancellor held that J.W.L. had not acted in willful contempt of the subject provision, as most delays in payment had been the result of conflicts over whether A.M.L. had properly consulted with him before incurring the subject expense and/or difficulties in interpreting the billing statements he had received. On appeal, A.M.L. maintains that there was “no evidence to support the [c]ourt’s justification for [J.W.L.] ’s failure to reimburse [her] ... within thirty (30) days.... ”
¶ 50. “Generally speaking, contempt matters are committed to the substantial discretion of the trial court which, by institutional circumstance and both temporal and visual proximity, is infinitely more competent to decide the matter than are we.” Cumberland, 564 So.2d at 845 (citations omitted). “When the parties have reached agreement and the chancery court has approved it,” in the absence of “fraud or overreaching,” this Court will enforce it. Bell v. Bell, 572 So.2d 841, 844 (Miss.1990). However, “[a] citation of contempt is proper only when the contemnor has willfully and deliberately ignored an order of the court.” Riddick, 906 So.2d at 826 (citations omitted) (emphasis added). See also Ladner v. Ladner, 206 So.2d 620, 623 (Miss.1968), overruled on other grounds by Bubac, 600 So.2d at 951 (the inquiry in a contempt proceeding is “whether or not the order was violated, whether or not it was possible to carry out the order of the court, and if it was possible, whether or not such violation was an intentional and willful refusal to abide by the order of the court.”); Bell on Mississippi Family Law at § 14.05 (“A finding of contempt requires that the provision in default be unambiguous and the violation willful.”)'. Viable defenses to contempt include “inability to comply with the court order” and/or “that the court order was unclear_” Ellis v. Ellis, 840 So.2d 806, 811 (Miss.Ct.App.2003) (“Ellis /”) (citations omitted).
¶ 51. This Court finds that the chancellor was presented with “substantial, credible evidence” that disputes over the phrase' “prior consultation with” in the noncovered-medieal-and-dental-expenses provision, as well as the inconsistent frequency and organization of A.M.L.’s billing statements, impaired J.W.L.’s ability to comply with the subject provision. Johnson, 859 So.2d at 1012. As “inability to comply with[,]” and a lack of clarity in the court order are both viable defenses to contempt, this Court cannot conclude that the chancellor’s ruling was “manifestly wrong, clearly erroneous,” or involved “an erroneous legal standard.” Johnson, 859 So .2d at 1012; Ellis I, 840 So.2d at 811. Accordingly, this issue is without merit.
*1020 IV. College Expenses

(1) Applicability, vel non, of Hambrick to C.D.

¶ 52. The chancellor determined that, under Hambrick, CJD.’s “behavior toward, and relationship with[,]” J.W.L. effectively “relieved ... his obligation to pay for” her college expenses. But because J.W.L. had not requested such relief, the chancellor only restricted his college-expense obligation for C.D.
¶ 53. A.M.L. argues that the Hambrick standard should not have been applied to C.D., because J.W.L. did not request relief from his obligation to her; the Agreement provided that they would provide “at least a four year college education” to any child with “the aptitude and desire to attend college,” and was not contingent upon satisfaction of the Hambrick standard; and it is J.W.L. who “refuses contact” with C.D., and she “has said that she is truly sorry the DHS incident happened and ... misses [J.W.L.].”
¶ 54. This Court has stated that:
[w]hen a father’s financial ability is ample to provide a college education and the child shows an aptitude for such, the court may in its discretion, after hearing, require the father to provide such education. The parental duty to send a child to college is not absolute, however, but is dependent upon the proof and circumstances of each case.
Saliba v. Saliba, 753 So.2d 1095, 1101 (Miss.2000) (citations omitted). In “exceptional” cases, “the child’s aptitude and qualifications for college” are not disposi-tive, when “the child’s behavior toward, and relationship with the father” does not “mak[e] the child worthy of the additional effort and financial burden that will be placed on [the father]. Sending children to college ... cannot ordinarily be demanded, but must be earned by children through respect for their parents, love, affection and appreciation of parental ef-forts_” Hambrick, 382 So.2d at 477
(emphasis added).
¶55. In Hambrick, this Court found that the noncustodial father was not required to pay college expenses for his daughter, as she had not had contact with him in more than six years, did not desire any contact, and described her feelings toward him as being “close to ‘hate.’ ” Id. This Court determined that “nothing in th[e] record ... would justify [the daughter’s] attitude toward her father.” Id. Because the daughter had shown “no love, affection, appreciation or consideration for her father” in years, this Court concluded that he should not be required to pay her college expenses. Id. at 477-78.
¶ 56. Preliminarily, this Court agrees with A.M.L. that J.W.L. did not request relief from his college-expense obligation to C.D. and that, pursuant to the Agreement, she is undeniably a child with “the aptitude and desire to attend college,” for whom the parties agreed to provide “at least a four year college education....”[46] As such, this Court has serious reservations about the chancellor’s decision to apply the Hambrick standard to C.D. But, assuming arguendo that such application was permissible, this Court finds Ham-brick inapposite. The record reflects that J.W.L.’s estrangement from C.D. resulted from his unilateral decision that he “couldn’t afford” to continue overnight and weekend visitation with her following the DHS investigation. Simply stated, this is not a Hambrick-type case of a child desir *1021 ing no contact with, and feeling hatred toward, her father, absent clear justification. As the GAL found, C.D. “is devastated by her father’s rejection of her.” Under these circumstances, this Court concludes that the chancellor was “manifestly wrong, clearly erroneous, [and] applied] an erroneous legal standard” in finding Hambrick applicable to C.D. and, based thereon, limiting J.W.L.’s college-expense obligation for her to “the MPACT and EE Savings bonds.... ” Johnson, 859 So.2d at 1012.

(2) Specific college expenses

¶ 57. The chancellor held that “[a]ll other aspects of the college expenses as set out in the original [Agreement] shall remain in full force and effect.” A.M.L. contends that, in so ruling, the chancellor “committed manifest error and abused her discretion in failing to define the college expenses necessary to provide C.D. with a four-year college education.” According to A.M.L., J.W.L.’s “financial ability to pay C.D.’s college expenses far exceeds [A.M.L.] ’s. Therefore, [J.W.L.] should be ordered to pay all of C.D.’s college expenses remaining after utilizing her MPACT funds and EE savings bonds,” to include:
registration fees, tuition, campus room and board, required supplies (incl. computer and printer), full meal plan, books, lab fees, sorority dues, and a reasonable allowance each month, and if she chooses to reside off campus, [J.W.L.] shall pay the equivalent of room and board on campus and a full meal plan.
J.W.L. responds that the Agreement “did not make [him] pay for college, but said that issue would be addressed in the future.”
¶58. Regarding specific college expenses, “[e]ach case is dependent upon the proof and circumstances it presents.”[47] SaUba, 753 So.2d at 1102. In light of the conclusion in Section IV(1) supra, this Court concludes that, on remand, the chancellor should define the specific college expenses required under the “four-year college education” provision in the Agreement. That determination should be based upon the “proof and circumstances” presented. Id.
V. Life insurance
¶ 59. The Agreement provided that J.W.L. “will maintain a life insurance policy in the amount of $1,000,000 upon himself, with the minor children as beneficiaries .... Each party shall provide written proof of such insurance coverage within thirty (30) days of the written demand by the other party.” (Emphasis added.) A.M.L. testified that she had requested written proof of J.W.L.’s life-insurance policy “several times[,]” but that all he provided was a printout from Trustmark Bank of a $3,395 check to Northwestern Mutual dated December 21, 2007. According to A.M.L., “I know Northwestern Mutual is an insurance company but I don’t know if the children are named as beneficiaries to that account or how that’s set up.” At the hearing, J.W.L. testified that he has a $1 million term life-insurance policy with Northwestern Mutual, with his daughters as the beneficiaries. According to J.W.L., “[i]t goes through the estate and is in my will that, that is how the monies are to be distributed.” The chancellor held that J.W.L. had provided sufficient proof of *1022 life-insurance coverage to A.M.L., such that he was not held in contempt.
¶ 60. According to A.M.L., by refusing to hold J.W.L. in contempt for failing to provide “written proof’ of life-insurance coverage within thirty days of her written demand, the chancellor was effectively “abrogatfing]” the Agreement. A.M.L. asserts that J.W.L.’s testimony was insufficient to satisfy the “written proof’ requirement, and that, in the absence thereof, he “should be held in contempt until he complies .... ” J.W.L. responds that “substance must reign over form. [He] had the required insurance coverage at all times. [A.M.L.] was not harmed, the children were not harmed. This was not a willful attempt to disobey a court order....”
¶ 61. “Generally speaking, contempt matters are committed to the substantial discretion of the trial court which, by institutional circumstance and both temporal and visual proximity, is infinitely more competent to decide the matter than are we.” Cumberland, 564 So.2d at 845.’ “When the parties have reached agreement and the chancery court has approved it,” in the absence of “fraud or overreaching,” this Court will enforce it. Bell, 572 So.2d at 844. However, “[a] citation of contempt is proper only when the contem-nor has willfully and deliberately ignored an order of the court.” Riddick, 906 So.2d at 826 (emphasis added). See also Ladner, 206 So.2d at 623, overruled on other grounds by Bubac, 600 So.2d at 951 (the inquiry in a contempt proceeding is “whether or not the order was violated, whether or not it was possible to carry out the order of the court, and if it was possible, whether or not such violation was an intentional and willful refusal to abide by the order of the court.”); Bell on Mississippi Family Law at § 14.05 (“A finding of contempt requires that the provision in default be unambiguous and the violation willful.”).
¶ 62. The “written proof’ requirement in the Agreement is clearly mandatory. But the requisite nature of such “written proof’ is less clear. A.M.L. maintains that the “written proof’ must establish that the policy is for $1 million, that it is upon J.W.L., and that it lists the “minor children as beneficiaries.” Such an interpretation does not strike this Court as either illogical or onerous. Yet, the chancellor accepted J.W.L.’s provision of some form of “written proof,” i.e., the Trustmark Bank printout, combined with his testifying, under oath, that he has maintained a $1 million term life-insurance policy with the children as the beneficiaries, as sufficient proof. Under these circumstances, this Court cannot conclude that the chancellor’s ruling was “manifestly wrong” or “clearly erroneous.” Johnson, 859 So.2d at 1012. On remand, however, the chancellor is advised to clarify the meaning of the phrase “written proof’ within the life-insurance provision of the Agreement to require J.W.L. to provide “written proof’ via a certified copy of the current version of the life-insurance policy (including a declarations sheet) which clearly shows the insured and beneficiaries.
VI. Attorney fees
¶ 63. “[T]he matter of determining attorney’s fees ... is largely entrusted to the discretion of the chancellor.” O’Neill v. O’Neill, 501 So.2d 1117, 1119 (Miss.1987) (citations omitted). See also Lahmann v. Hallmon, 722 So.2d 614, 623 (Miss.1998) (“Finding no manifest error, this Court affirms' the award of attorney fees.”).

(1) Modification

¶ 64. “Attorney fees are not awarded in child support modification *1023 cases unless the party requesting fees is financially unable to pay them.” Id. (quoting Setser v. Piazza, 644 So.2d 1211, 1216 (Miss.1994)) (emphasis added). The chancellor held that A.M.L. “failed to timely introduce any evidence as to attorney’s fees or establish her inability to pay her own attorney’s fees at the trial on the merits, therefore, her request for attorney’s fees, is denied.”
¶ 65. According to A.M.L.:
[o]n direct examination ..., she testified to incurring $33,038.26 in attorney fees and her itemized attorney fees statements were introduced into evidence as Plaintiff Exhibit 13.[48] Also, on direct examination, [A.M.L.] testified to her inability to pay her own attorney’s fees.[49 ] [A.M.L.] ’s attorney testified to the factors set forth in McKee v. McKee, 418 So.2d 764, 767 (Miss.1982).
As such, A.M.L. contends that the chancery court “abused its discretion in finding that [she] did not establish her inability to pay her own attorney’s fee at the trial on the merits.” J.W.L. responds the chancellor did not abuse her discretion in denying this claim, as A.M.L. “testified that she did in fact pay her attorney fees while alleging the inability to pay[,]” failed to “designate an expert witness with regard to attorney fees[,]” and “did not meet her burden pursuant to McKee.”
¶ 66. A review of the record leads this Court to conclude that the chancellor was “manifestly wrong” in denying A.M.L.’s modification-related attorney fees for failure to “timely introduce any evidence” thereon. Johnson, 859 So.2d at 1012. At trial, A.M.L. did offer some testimony and exhibits on attorney fees and her inability to pay. While this Court makes no comment on A.M.L.’s entitlement, vel non, to such attorney fees; on remand, the chancellor should rule upon the merits of this issue in light of the evidence presented.

(2) Contempt

¶ 67. “When the court denies a spouse’s petition for contempt, no award of attorneys fees is warranted.” Lahmann, 722 So.2d at 623 (citation omitted). Based upon the conclusions in Sections 111(2) and V supra, affirming the chancellor’s findings that J.W.L. did not act in willful contempt of Agreement provisions regarding the reimbursement of noncovered medical and dental expenses and the retention of a life-insurance policy, this Court concludes that A.M.L. is not entitled to contempt-related attorney fees.
CONCLUSION
¶ 68. Based upon this analysis, this Court affirms the chancellor’s findings: (1) that A.M.L. had not “actively engaged” in alienation efforts; (2) that there would be no “upward retroactive modification” in J.W.L.’s child-support obligations for C.D., W.X., and Y.Z.; (3) that J.W.L. did not act in contempt in failing to comply with the thirty-day, noncovered-medical-and-dental-expenses reimbursement provision of the
*1024 Agreement; (4) that J.W.L. did not act in contempt of the “written proof’ requirement in the life-insurance provision of the Agreement; and (5) that A.M.L.’s request for contempt-related attorney fees should be denied. This Court reverses the chancellor’s findings: (1) of child-custody modification, as there was no “material change in circumstances” in the custodial home and no Albright analysis at the time of the initial ruling;[50] (2) of retroactively terminating J.W.L.’s child-support obligations for A.B., as such termination should be effective from October 15, 2009, the date of the “Opinion and Judgment;” (8) of applying Hambrick to C.D. and, based thereon, limiting J.W.L.’s college-expense obligation for her; and (4) of denying A.M.L.’s modification-related attorney fees for failure to “timely introduce any evidence” thereon. On remand, the chancellor shall: (1) clarify the meaning of the phrase “pri- or consultation with” in the noncovered-medical-and-dental-expenses provision of the Agreement; (2) define the specific college expenses required under the “four year college education” provision of the Agreement; (8) clarify the meaning of the phrase “written proof’ in the life-insurance provision of the Agreement to require J.W.L. to provide “written proof’ via a certified copy of the current policy (including a declarations sheet) which clearly shows that it is for $1 million, upon J.W.L., and lists the minor children as beneficiaries; and (4) rule on the merits of A.M.L.’s request for modification-related attorney fees, in light of the evidence presented.
¶ 69. ON DIRECT APPEAL: AFFIRMED IN PART, REVERSED AND RENDERED IN PART; AND REMANDED. ON CROSS-APPEAL: AFFIRMED.
WALLER, C.J., CARLSON AND DICKINSON, PJJ, LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ, CONCUR. PIERCE, J„ SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON, P.J, RANDOLPH AND CHANDLER, JJ.

. At this point, the chancellor did not conduct a “best interest” analysis under Albright v. Albright, 437 So.2d 1003 (Miss.1983).

. A.M.L. filed a "Motion to Amend and/or Clarify Findings and Judgment, or, in the Alternative, Grant a New Trial” ("Motion to Amend Judgment”), as well as a "Petition for Citation of Contempt and Other Relief” which pertained to J.W.L.'s alleged failure to comply with several Agreement provisions. J.W.L. filed a "Motion to Enforce Transfer of Custody, Terminate Child Support and For Other Relief.”

. The chancellor offered her Albright analysis and concluded that “the scale tips in favor of” J.W.L., but stood by her ruling holding custody modification in abeyance.

. For anonymity purposes, this Court has changed the initials of each child.

. As of August 14, 2012, A.B. is twenty-two years old, C.D. is twenty-one years old, W.X. is eighteen years old, and Y.Z. is fifteen years old.

. J.W.L. married his current wife in 2004.

. The record reflects e-mail correspondence between A.M.L. and J.W.L. on his unilateral decision to discontinue weekend visitation with A.B. A December 8, 2003, e-mail from A.M.L. to J.W.L. provided that "I do not agree to the changes in visitation that you left on my cell phone today and emailed me about.... If you do plan on having visitation with them, I expect it to be with all of them.” In reply, J.W.L. e-mailed A.M.L. that his attorney "sees nothing amiss about this.... You may seek legal advice if you wish.”

. A.B. testified that, at the time, "I think I really looked for ... someone to fill the hole my dad left.”

. Regarding her relationship with the twenty-one-year-old, A.B. testified that A.M.L. "told me I couldn’t see him, couldn’t talk to him. *1007 She grounded me ... most of my ... 14th year. She called him told him not to talk to me.... I mean just about everything she could.” A.M.L. corroborated A.B.’s testimony, stating that "I did talk to [A.B.] about the fact that if this relationship went sexual that he could be arrested and that I considered calling the police.” Additionally, an April 5, 2004, e-mail from A.M.L. to J.W.L. provided that "I have told her she cannot date [the older man] ... because I think there is just too great an age difference.”

. At some point, according to A.M.L., she asked A.B. about the alleged rape, and A.B. "was just saying that she was raped or that a boy at church had raped her. And yet when I talked to her again it was no mom. It was back and forth.”

. A.M.L. testified that those parents were “very sensitive” to the issue of sexual abuse, as three of their adopted children had previously been sexually abused, and the husband was "a guardian ad litem for children....”

. Furthermore, A.B. testified that J.W.L. had never sexually abused her.

. J.W.L.'s conspiratorial allegations purportedly were influenced by (1) that C.D. "first communicated it to a friend and ... [the] mother of [that] friend[,] who also happened to be a close friend of [A.M.L.]'s[,] ... didn't communicate this to [A.M.L.] but rather reported it to DHS[,]” and (2) his claim that A.M.L. previously had given C.D. a tape recorder for the purpose of recording conversations at his home.

. That child ultimately was placed for adoption.

.According to J.W.L.:
[t]here has been a substantial adverse change in circumstances warranting modification of custody. As a direct result of [A.M.LJ’s consistent pattern of lying, manipulation and parental alienation of the parties[’] four children, [A.M.L.] has succeeded in alienating the two oldest children from [J.W.L.]. In order to prevent further alienation of the two youngest children[,] ... [J.W.L.] prays this court award him full legal and physical custody of [W.X.] and [Y.Z.].
Regarding W.X. and Y.Z., J.W.L. claimed that the "substantial adverse change in circumstances warranting modification of custody” was they were "becoming increasingly detached, disrespectful and incorrigible [,] ” which he attributed to A.M.L. "losing control” of them. (Emphasis added.) At trial, J.W.L. specified that “I'm fearful that over time if [custody is not transferred] that the patterns of A.B. and C.D. will follow with my younger two[,]” i.e., "bad grades, promiscuity...."

. J.W.L. requested that the chancery court "require child support to be paid by [A.M.L.] to [him] for the benefit of [Y.Z.] and [W.X.].”

. Between August 2008 and November 2008, A.B. lived with her fiancé and his family. According to A.B., "my intention of moving out was to move in with him, build a relationship, continue going to school and find work somewhere else.” She subsequently moved back in with A.M.L. In 2009, A.B. gave birth to a second child, who lives with her.

. At that time, A.B. was nineteen years old and had completed her first semester at Holmes Community College; C.D. was eighteen and was to begin college in the fall; W.X. was fourteen and had completed eighth grade; and Y.Z. was twelve and had completed sixth grade.

. Based upon that conclusion, the GAL did not conduct an Albright analysis, "because I don't believe that you met the threshold question legally before you ever get to Albright.”

. During seventh grade, W.X. was suspended from school for having cigarettes, was caught shoplifting a pair of sunglasses with her friends at the mall, and, according to J.W.L., slapped A.M.L. on one occasion and called her a "bitch.''

. W.X. attributed such improvements to the fact that she "started caring again.” According to J.W.L., however, W.X.’s improved grades only came after he offered a trip to Disney World as an incentive.

. However, at a post-trial hearing, the Guardian Ad Litem ("GAL”) testified regarding a 2009 incident, reported to her by Y.Z., in which, following an argument because Y.Z. had refused her paternal grandmother’s request that she place her dishes in the sink, J.W.L. "ran upstairs ... and ... got [Y.Z.] and dragged her down the steps by her blouse, shoved her in the kitchen, shoved her into the refrigerator, then apologized for his behavior.” According to the GAL, J.W.L. admitted grabbing Y.Z. by the blouse and shoving her into the kitchen, but later apologized. Yet J.W.L. testified at the post-trial hearing that, while he did grab Y.Z. by the blouse and brought her downstairs, he did not apologize and does not regret his conduct. According to J.W.L., "I consider it very restrained given what [Y.Z.] did.”

. According to A.M.L., J.W.L.'s "refusal to visit” A.B. and C.D., as well as instances of difficulty in obtaining medical treatment for the children "without [J.W.LJ’s consent[,]” constituted "substantial and material changes in circumstances which have adversely affected the minor children....”

. A.M.L. maintained the following "substantial and material changes”: J.W.L.’s increased income; increased expenses for the children’s "necessities” as they grew older; and increased "food and shelter” costs, based upon J.W.L.'s refusal to exercise his visitation rights with A.B. and C.D.

. According to A.M.L., "this requirement has placed a financial burden on [her] when [J.W.L.] stubbornly refused to pay said expense[s] because [A.M.L.] did not seek his approval in advance for medical care which she did not believe would exceed $200.”

. A.M.L. contended that college expenses:
should include registration fees, tuition, campus room and board, required supplies (incl. computer and printer), full meal plan, books, lab fees, sorority dues, and a reasonable allowance each month, and if a child chooses to reside off campus, [J.W.L.] shall pay the equivalent of room and board on campus and a full meal plan....

. A.M.L. stated that J.W.L. "has failed to provide written proof of insurance coverage ... despite [her] written demand and her attorney’s written demand.” Furthermore, A.M.L. alleged that J.W.L. had failed to reimburse her, within thirty days of proof of payment, for noncovered medical expenses.

. The GAL testified that increased visitation was recommended because J.W.L. "offers them a stability and a discipline ... and to have more structured lives and to work toward goals a little better.”

. On appeal, A.M.L. asserts that "[t]he chancellor’s finding that [W.X.] slapped [A.M.L.] and called her a bitch is based solely on [J.W.LJ’s uncorroborated testimony_”

.Elsewhere, the chancellor stated that "[i]f any alienation occurred, it resulted from [J.W.L.] refusing to visit with his two older daughters....”

. This Court reiterates, see footnote 1 supra, that the chancellor had not conducted an Albright analysis before making this finding.

. As to the modification of child custody, the chancellor added an Albright analysis, then concluded that “the scale tips in favor of [J.W.L.] being awarded custody of all the children.” Nonetheless, the chancellor stood by her decision to hold that ruling in abeyance.

. On cross-appeal, J.W.L. argues that "actual physical custody should have been modified to [J.W.L.],” as the chancery court erred in (1) "not immediately ordering the change in actual physical custody[,]” and (2) “not finding [A.M.L.'s] conduct alienated the affections of the children for their father.”

. Any "material change in circumstances must be in the custodial home.” Giannaris v. Giannaris, 960 So.2d 462, 469 (Miss.2007) (citation omitted).

. According to this Court:
[p]sychological as well as legal considerations undergird this rule. The best interest of the child ordinarily requires a certain stability in the custody arrangement.... And, once the question of custody has been adjudged, conservation of wear and tear on the time, the purse strings and the emotions of the parties dictates that the issue not be reopened unless circumstances really have changed and the change has adversely affected the child. Conservation of all too scarce judicial resources is likewise important.
Cheek v. Ricker, 431 So.2d 1139, 1143 (Miss.1983). See also Tucker v. Tucker, 453 So.2d 1294, 1298 (Miss.1984) ("children do not need to be bounced back and forth between their parents like a volleyball....”); Ballard v. Ballard, 434 So.2d 1357, 1360 (Miss.1983) (a change in custody is a "jolting, traumatic experience.”).

.She alternatively maintains that the conditions imposed by the chancellor constituted an abuse of discretion, insofar as they "do not involve the safety of the ... children[,]” and “are directed more at the children, than [A.M.L.].”

. Relatedly, J.R.L. testified that both A.M.L. and J.W.L. would "get onto” her if she had poor grades.

. See also Hambrick, 382 So.2d at 476 ("The chancellor correctly held that the past due installments of child support became vested as they became due and that they could not thereafter be reduced.”).

. See also Roberts v. Brown, 805 So.2d 649, 654 (Miss.Ct.App.2002) ("it is ordered that Roberts's obligation to pay child support for Margaret is terminated retroactively as of the date of the judgment from which this appeal was taken.”).

. Furthermore, the chancellor failed to conduct an Albright analysis at the time of the initial custody-modification determination, which itself constitutes application of "an erroneous legal standard....” Johnson, 859 So.2d at 1012.

. This appears to be the intention of the chancellor, who stated in her "Order on Motion to Amend and/or Clarify Findings and Judgment, or, in the Alternative, Grant a New Trial” that "[J.W.L.], as well as [A.M.L.], will be held in contempt of this [c]ourt and subject to appropriate sanctions, upon a showing of sufficient proof that either party has violated this [cjourt's order by failing to put forth a good faith effort to attend counseling and cooperate with the counselor.”

.A.M.L. does not maintain that the chancellor erred in terminating child support for A.B., but only disputes the propriety of "retroactively” terminating that support.

. The record reflects multiple e-mail requests from A.M.L. to J.W.L. regarding un-reimbursed, noncovered medical expenses.

. Even A.M.L. conceded that she had not submitted her requests for payment at consistent intervals.

. This was acknowledged by the chancellor in her finding that J.W.L. was not in contempt for unreimbursed medical expenses due, in part, to "conflicts as to whether [A.M.L.] had consulted with [J.W.L.] before incurring expenses more than $200.00.... ”

. For example, "[t]he quality and quantity of necessities for which a parent is liable has been gauged in American and English Jurisprudence from time immemorial by the parents’ station in life.” Saliba, 753 So.2d at 1102-03 (quoting Golay v. Golay, 35 Wash.2d 122, 210 P.2d 1022, 1023 (1949)).

. J.W.L.'s "respective financial abilitfy]” is not in question, as he testified that his current gross monthly income as an "internist cardiologist electrophysiologist” was approximately $40,000, not including quarterly bonuses.

. A.M.L. testified that she did not have the ability to pay her alleged attorney fees of $33,038.26, as "[t]o date I have paid them by putting personal household [expenses], gasoline, groceries ... on credit cards...." However, at a subsequent hearing, counsel for J.W.L. noted that the attorney-fee figures provided by counsel for A.M.L. amounted to only $28,175.

. A.M.L. provided that her current monthly income was $4,750 ($2,350 in alimony and $2,400 in child support). She added that her "only real asset” is her home "and a little bit in an IRA.” While acknowledging that she has a masters degree in chemical engineering, A.M.L. noted that she had been a stay-at-home mom for four children, whom she had home-schooled for eight years.

. Based thereon, there is no child-custody modification ruling to be held in abeyance. As to the court-imposed conditions, although there is no child-custody modification ruling to be held in abeyance subject to adherence, several of those conditions are otherwise proper. The absence of adherence to conditions regarding family counseling and A.M.L. supporting J.W.L.'s discipline may provide a legitimate basis for contempt proceedings.