# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01781-COA

ARTHUR RANDALLSON AND APRIL RANDALLSON        APPELLANTS

v.

RANDALL GREEN AND LAURA GREEN        APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 11/12/2014 |
| TRIAL JUDGE: | HON. VICKI B. DANIELS |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | JERRY WESLEY HISAW |
| ATTORNEYS FOR APPELLEES: | JASON D. HERRING |
| | MICHAEL SPENCER CHAPMAN |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| TRIAL COURT DISPOSITION: | AWARDED CUSTODY TO GRANDPARENTS AND AWARDED VISITATION TO NATURAL PARENTS |
| DISPOSITION: | AFFIRMED - 06/21/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., CARLTON AND FAIR, JJ.**

**LEE, C.J., FOR THE COURT:**

¶1. Randall and Laura Green were awarded full legal and physical custody of their paternal granddaughter, Aeva Randallson. Aeva's parents—Arthur[1] and April Randallson—claim the chancellor erred in (1) relying on requests for admissions to determine custody, (2) awarding custody to Randall and Laura, and (3) awarding supervised discretionary visitation.

---

[1] Arthur's birth name was Jason Green.

**FACTS AND PROCEDURAL HISTORY**

¶2.     Arthur and April were married on June 24, 2004.  And on July 14, 2004, April gave birth to their daughter, Aeva.[2]

¶3.     In 2012, according to Arthur's father—Randall—Arthur was considering a divorce from April and moved into an apartment paid for by Randall and Arthur's mother—Laura.[3] According to Randall, Arthur stated that April was physically and verbally abusive.  For example, April threw a Lysol can at Arthur's head; April told Aeva, "I hope your father dies . . ."; and April threatened suicide to get her way.  According to Randall, Arthur also stated that his and April's house was a "hoarding house," and "the dogs and cats would just do their business wherever they were[, which] was left . . . for days without being cleaned up." Randall and Laura rescued one of the dogs, which had an abscessed jaw and tapeworms due to a flea infestation.  Finally, according to Randall, Arthur stated that April was addicted to painkillers, slipped unprescribed pills to Arthur, and administered ZzzQuil or NyQuil to Aeva to induce sleep.  For reasons unknown to Randall, Arthur eventually moved back into the house with April and Aeva.[4]

¶4.     On March 4, 2013, Randall and Laura filed a complaint in the Chancery Court of

---

[2] DNA testing has determined that Arthur is Aeva's biological father.

[3] At trial, Arthur stated that he moved into the apartment to work on his master's thesis.

[4] Laura stated her testimony would be substantially similar to Randall's.

DeSoto County, Mississippi, for custody of Aeva.[5] The summonses were issued on March 19, 2013. And on March 20, 2013, Randall and Laura gave notice of service of their discovery requests. Fifty-one days later, on May 9, 2013, Arthur and April filed their answer to the complaint as well as their responses to the discovery requests.[6]

¶5. In June 2014, the chancellor entered an emergency order due to Arthur and April's failure to cooperate with the guardian ad litem (GAL). After the initial visit, the GAL removed Aeva from the house on an emergency temporary basis because the house was unsuitable.[7] Aeva was allowed to return three weeks later even though the condition of the house was not completely rectified. After several visits, the GAL concluded that removing Aeva from the custody of her parents would not be in Aeva's best interest. However, the GAL reserved the right to alter or amend her recommendations based on the evidence and testimony at trial.

¶6. In July 2014, the chancellor entered an order granting Randall and Laura two visitation dates. These visits were the first time Aeva had interacted with Randall and Laura since she was an infant.

---

[5] The complaint was amended on July 17, 2014, to include domestic-violence provisions.

[6] Arthur and April each filed a notice of the filing of their responses to the discovery requests. Arthur's was dated April 30, 2013; April's was not dated. The affidavits attached to the responses were dated May 7, 2013. However, counsel for April and Arthur mailed a letter dated May 9, 2013, to counsel for Randall and Laura enclosing the following: (1) an answer to the complaint, and (2) answers to interrogatories, requests for production, and requests for admissions.

[7] The GAL did not take photographs during the initial visit.

3

¶7.     At the beginning of trial, Christopher Gray testified about his marriage to April from June 2000 until February 2004. According to Gray, April was "anything from extremely pleasant, kind, loving to the exact and polar opposite. So extreme anger [and] violence . . . ." He stated that April was physically and verbally abusive—April hit him, cut him with a knife, and threatened suicide. Gray also stated that April would cut herself whenever she was not getting her way. Gray testified that April was violent toward animals and that animal urine and feces were inside the house. Finally, Gray testified that he had to recover mentally and emotionally from his marriage to April.

¶8.     Arthur and April denied any domestic violence during their marriage. April stated that she had never thrown anything at Arthur, but probably threw something at her ex-husband, Gray. She also stated that there was no "knife incident" with Arthur, but there was an *accident* with Gray.

¶9.     When asked about an instance where April apparently banged her head against the wall, fainted, and went to the hospital, Arthur stated the "banging of the head on the wall was just sort of like a casual frustration thing." Arthur testified that April threatened suicide approximately six times over ten years, but "it was [never] a legitimate threat." Arthur also testified that on at least one occasion, April told Aeva she wished Arthur was dead, but "it was never intended literally." April stated that she probably used foul language in front of Aeva. Arthur repeatedly stated that Randall and Laura used foul language in front of him when he was a child.

¶10.    April acknowledged the deplorable condition of their house, but stated it was not

4

entirely her fault—Arthur was also to blame. Arthur and April admitted to animal urine and feces, animal vomit, fleas, rats, boxes, and filth. April claimed the house would not get that bad again. However, April's mother—Bethany Blanton—testified that she had previously helped clean Arthur and April's house, and the house would always return to the way it was.

¶11.   Blanton also testified that April was depressed. Dr. Lee Van Duren, a psychiatrist, reviewed April's medical and pharmacy records, and stated that the combination, amount, and frequency of prescribed medications that April was taking would render a person physiologically dependant and impaired, or "generally not functional." Specifically, they would negatively impact memory, cognitive ability, and ability to experience emotion. Dr. Van Duren stated that April's actions—described by Gray—were consistent with someone on those particular medications.[8]

¶12.   Although Arthur worked full-time, he did not have fixed hours and earned approximately $20,000 per year. April worked four days per month and earned approximately $500 per month. Arthur testified that he and April were "very deep in debt." As a result, Aeva did not have medical insurance, and neither Arthur nor April had applied for Medicaid even though it "may have been a potential option." Furthermore, Aeva had never been to an eye doctor—despite an abnormal screening at school—or dentist.

¶13.   Both Arthur and April acknowledged that from 2012 to 2013, Aeva had thirty-eight tardies and twelve absences in school. And from 2013 to 2014, Aeva had seventeen tardies.

---

[8] Dr. Van Duren referred specifically to April's use of Hydrocodone, Soma, and Xanax. However, April testified that, in the past few years, she had also been prescribed Ideral, Imitrex, Lorazepam, Phenergan, Paxil, and Treximet.

Interestingly, Arthur testified he was named "parent of the year."

¶14. Toward the end of trial, Arthur testified that he believed his mother, Laura Green, had "tendencies towards pedophilia." However, Arthur's brother—Karl Green—denied the allegations against his mother. Furthermore, Karl said he trusted both of his parents with his two children.

¶15. At the end of the trial, the GAL acknowledged that her initial opinion was that a change in custody was not in Aeva's best interest. She testified that Aeva was a normal, honor-roll student who appeared clean and healthy. She also testified that Aeva loved her parents, and it would be emotionally traumatic for her to be taken away from them. However, the GAL stated that Arthur and April may be unfit parents based on the evidence presented at trial. The GAL expressed significant concerns about Arthur and April's maintenance of the house, April's depression, April's prescription-drug use, Arthur and April's financial ability, Aeva's lack of medical insurance, Aeva's lack of dental and vision care, Arthur's unsubstantiated claims about Laura, and the requests for admissions.

¶16. Ultimately, the chancellor found Arthur and April were unfit parents. The chancellor also found April was a perpetrator of domestic violence, and after conducting an *Albright*[9] analysis, determined it was in Aeva's best interest to give full legal and physical custody to Randall and Laura, with supervised discretionary visitation. Arthur and April appeal.

## STANDARD OF REVIEW

¶17. "Findings of fact made by a chancellor may not be set aside or disturbed upon appeal

---

[9] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

if they are supported by substantial, credible evidence." *Strait v. Lorenz*, 155 So. 3d 197, 203 (¶19) (Miss. Ct. App. 2015) (quoting *A.M.L. v. J.W.L.*, 98 So. 3d 1001, 1013 (¶23) (Miss. 2012)). "This Court will not disturb a chancellor's findings unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard." *Id.* (citing *Sanderson v. Sanderson*, 824 So. 2d 623, 625 (¶8) (Miss. 2002)). "Legal questions are reviewed de novo." *Id.* (citing *Russell v. Performance Toyota Inc.*, 826 So. 2d 719, 721 (¶5) (Miss. 2002)).

## DISCUSSION

### I.     Requests for Admissions

¶18.    In their first issue, Arthur and April claim the chancellor erred in relying on their deemed admissions to determine custody.

¶19.    This Court has strictly enforced the application of Mississippi Rule of Civil Procedure 36 according to its terms. *Boyd v. Boyd*, 83 So. 3d 409, 416 (¶19) (Miss. Ct. App. 2011). "The rule states that a party has thirty days in which to submit a response to a request for admission, or within forty-five days after service of the summons upon a defendant." *Id.* (citing M.R.C.P. 36(a)). "Matters will be deemed admitted after this time period, unless the court allows for either a shorter or longer period of time in which to answer." *Id.*

> However, the trial court, on motion, has the discretion to "permit withdrawal or amendment [of a matter admitted] when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits."

*Id.* (quoting M.R.C.P. 36(b)).

¶20. The record is clear that Arthur and April filed untimely responses to Randall and Laura's requests for admissions. *See id.* at (¶21). They failed to request a withdrawal or amendment of the admissions prior to trial. *See id.* Thus, the operation of the rules deems the matters admitted. *Id.* (citing M.R.C.P. 36(a)). "Matters admitted by default under Rule 36(a) are established unless and until the trial court allows amendment or withdrawal by motion under Rule 36(b)." *Id.* (quoting *DeBlanc v. Stancil*, 814 So. 2d 796, 799 (¶17) (Miss. 2002)).

¶21. However, in *Gilcrease v. Gilcrease*, 918 So. 2d 854 (Miss. Ct. App. 2005), we held that "child custody is a judicial determination, and is never to be regarded as a merely evidentiary matter." *Boyd,* 83 So. 3d at 417 (¶23). Thus, basing a determination of child custody solely on a Rule 36 admission is improper. *Id.*

¶22. In her bench ruling, the chancellor considered Arthur and April's admissions. But then the chancellor stated:

> [T]his [c]ourt is a court of equity and the attorneys for the plaintiffs know that. They did not . . . rest their case [after the admissions were deemed admitted and] ask me to find by clear and convincing evidence that the parents [were] unfit . . . . They went on to present evidence to this [c]ourt, which gave the [c]ourt some . . . very real concerns.

After discussing the evidence, the chancellor stated that she "considered the totality of the [r]equest for [a]dmissions, the guardian [a]d litem report, [and] the testimony . . . from all of the witnesses" and found "that the [natural-]parent presumption [had] been overcome."

¶23. Upon a thorough review of the record, we do not find that the chancellor abused her discretion. *See id.* at 418 (¶28). It is clear that the admissions were not the sole basis for the

custody decision. *See id.* The chancellor heard all of the testimony at trial and used the GAL's report as part of her consideration, in addition to the admissions by Arthur and April. *See id.* Therefore, this issue is without merit.

## II. Custody

¶24. In their second issue, Arthur and April claim the chancellor erred in awarding third-party custody to Randall and Laura.

¶25. "In custody battles between a natural parent and a third party, it is presumed that it is in the child's best interest to remain with his or her natural parent." *Smith v. Smith*, 97 So. 3d 43, 46 (¶8) (Miss. 2012) (citing *Carter v. Taylor*, 611 So. 2d 874, 876 (Miss. 1992)). To be awarded custody, therefore, the third party must first clearly rebut the natural-parent presumption or preference; if it is successfully rebutted, the chancellor must then examine the *Albright* factors and determine that third-party custody serves the best interest of the child." *Id.* (citing *Logan v. Logan*, 730 So. 2d 1124, 1127 (Miss. 1998)).

### A. Natural-Parent Presumption

¶26. "The natural-parent presumption can be rebutted by a clear showing that (1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody." *Id.* (citing *Carter*, 611 So. 2d at 876).

¶27. In her written opinion, the chancellor provided thorough findings of fact in regard to her determination that Arthur and April were unfit parents. The chancellor had concerns with Arthur and April's attempts to thwart the GAL; the condition of their house; their ability

9

to maintain the condition of the house; April's prescription-drug use; threats and cursing; the lack of, and indifference toward, obtaining medical insurance for Aeva; the lack of, and indifference toward, providing dental and vision care for Aeva; and the number of tardies and absences from school.

¶28. Furthermore, the chancellor believed Arthur's statements to his parents to be true—even though Arthur denied making those statements. *See Bratcher v. Surrette*, 848 So. 2d 893, 896 (¶16) (Miss. Ct. App. 2003) ("The chancellor, by [her] presence in the courtroom, is best equipped to listen to the witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses.").

¶29. Based upon our review of the record and our limited standard of review for factual findings of chancellors, we find there is substantial evidence to support the chancellor's finding by clear and convincing evidence that Arthur and April were unfit parents.

### B. Mississippi Code Annotated Section 93-5-24(9) (Rev. 2013)

¶30. The chancellor then determined that April was a perpetrator of domestic violence under Mississippi Code Annotated section 93-5-24(9). Section 93-5-24(9)(a)(i) provides:

> In every proceeding where the custody of a child is in dispute, there shall be a rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody or joint physical custody of a parent who has a history of perpetrating family violence. The court may find a history of perpetrating family violence if the court finds, by a preponderance of the evidence, one (1) incident of family violence that has resulted in serious bodily injury to, or a pattern of family violence against, the party making the allegation or a family household member of either party. The court shall make written findings to document how and why the presumption was or was not triggered.

10

Furthermore, section 93-5-24(9)(b)(i) provides: "If custody is awarded to a suitable third person, it shall not be until the natural grandparents of the child have been excluded and such person shall not allow access to a violent parent except as ordered by the court."

¶31. According to Randall, Arthur said that April threw a Lysol can at his head, which drew blood. He also stated that it was April's "missile of choice," indicating that it happened often.[10] As stated, even though Arthur denied these statements at trial, the chancellor stated that she "[did] not believe [his] testimony." "When conflicting testimony on the same issue is presented, the chancellor sitting as trier of fact must determine which version [she] finds more credible." *Bratcher*, 848 So. 2d at 896 (¶16).

¶32. We cannot find that the chancellor abused her discretion in finding April was a perpetrator of domestic violence. Thus, the chancellor correctly determined it would not be in Aeva's best interest to be in April or Arthur's custody. *See JP v. SVB*, 987 So. 2d 975, 982 (¶17) (Miss. 2008) (finding the mother was not a suitable custodial parent because she resided in the house with the perpetrator of domestic violence and "rationalize[d his] violent behavior.")

### C.    *Albright* Analysis

¶33. Before making her final ruling, the chancellor, "out of an abundance of caution," conducted an *Albright* analysis.

¶34. The *Albright* factors are as follows: (1) age, health, and sex of the child; (2) a determination of the parent who had the continuity of care prior to the separation; (3) which

---

[10] According to Randall, Arthur also mentioned a knife incident as well as an incident where April slapped him.

11

parent has the best parenting skills and which parent has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) the physical and mental health and age of the parents; (6) the emotional ties of the parent and child; (7) the moral fitness of the parents; (8) the home, school, and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) the stability of the home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship.[11] *Albright*, 437 So. 2d at 1005.

¶35. According to the chancellor, the following factors favored awarding custody of Aeva to Randall and Laura: age, health, and sex of the child; parenting skills and willingness and capacity to provide; employment of the parent and responsibilities of that employment;[12] physical and mental health of the parent; moral fitness of the parent; home, school, and community record of the child; and stability of the home environment and employment. The chancellor found the following factors favored Arthur and April: continuity of care, the age of the parent, and emotional ties. And the chancellor found the following factor did not apply: preference of the child. Ultimately, the chancellor found that the best interest of Aeva would be served by granting custody to Randall and Laura.

¶36. "In order to determine whether or not the chancellor was manifestly wrong, clearly

---

[11] To be clear, we note that "custodian(s)" should be substituted in place of "parent(s)" when applying the *Albright* factors to the facts of this particular case.

[12] The chancellor did not specifically state that this factor favored Randall and Laura; however, it may be inferred from the chancellor's comments.

erroneous or abused [her] discretion in applying the *Albright* factors, we review the evidence and testimony presented at trial under each factor to ensure [her] ruling was supported by the record." *Hall v. Hall*, 134 So. 3d 822, 828 (¶21) (Miss. Ct. App. 2014) (quoting *Hollon v. Hollon*, 784 So. 2d 943, 947 (¶13) (Miss. 2001)). "Further, this Court cannot reweigh the evidence and must defer to the chancellor's findings of the facts, so long as they are supported by substantial evidence." *Id.* (citing *Carter v. Carter*, 735 So. 2d 1109, 1114 (¶18) (Miss. Ct. App. 1999)). Upon thorough review of the record, we cannot say the chancellor's decision to award custody to Randall and Laura was manifestly wrong or clearly erroneous. This issue is without merit.

### III. Visitation

¶37. In their final issue, Arthur and April claim the chancellor erred in awarding only supervised discretionary visitation.

¶38. "In granting or denying visitation, a chancellor's primary concern must be the best interest of the child, while still considering 'the rights of the non-custodial parent[s], recognizing the need to maintain a healthy, loving relationship between the non-custodial parent[s] and [their] child.'" *Saint v. Quick*, 24 So. 3d 395, 403-04 (¶30) (Miss. Ct. App. 2009) (quoting *Harrington v. Harrington*, 648 So. 2d 543, 545 (Miss. 1994)). "Furthermore, 'there must be evidence presented that a particular restriction on visitation is necessary to avoid harm to the child before a chancellor may properly impose the restriction.'" *Id.* at 404 (¶30).

¶39. Evidence was presented regarding April's prescription-drug use, her threats of suicide,

and domestic violence. Evidence was also presented regarding the deplorable condition of Arthur and April's house—animal urine and feces, animal vomit, fleas, rats, boxes, filth—and their inability to maintain the condition of their house. In light of this evidence, we cannot say the chancellor abused her discretion in restricting visitation. This issue is without merit.

¶40.   **THE JUDGMENT OF THE CHANCERY COURT OF DESOTO COUNTY IS AFFIRMED.   ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR, JAMES, WILSON AND GREENLEE, JJ., CONCUR.**