# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00190-COA

CLAYTON O. BRECHEEN

APPELLANT/
CROSS-APPELLEE

v.

MALLORY BRECHEEN

APPELLEE/
CROSS-APPELLANT

DATE OF JUDGMENT:          02/16/2022
TRIAL JUDGE:               HON. JAYE A. BRADLEY
COURT FROM WHICH APPEALED: LINCOLN COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:    JARED FRANK EVANS
ATTORNEY FOR APPELLEE:     ELISE BERRY MUNN
NATURE OF THE CASE:        CIVIL - DOMESTIC RELATIONS
DISPOSITION:               ON DIRECT APPEAL: AFFIRMED.  ON
                           CROSS-APPEAL: AFFIRMED - 04/23/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., GREENLEE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     A woman filed for divorce from her husband on the ground of habitual cruel and inhuman treatment, including spousal domestic abuse.  They eventually agreed to a divorce. Due to his history of family violence, the chancery court restricted the husband's visitation with the couple's child.  It further ordered the husband to pay child support and classified his severance package as marital property, splitting it evenly between the two parties.

¶2.     The husband appealed.  The wife cross-appealed, claiming the chancery court erred by allowing the husband to claim the child for taxes every other year.  Finding no error, we affirm.

## FACTS

¶3.     Clayton and Mallory met and began dating in December 2017. At the time, Clayton was 34 and Mallory was 25 years old. Eight months later, in August 2018, the couple married and lived together in Lincoln County. Mallory had a son from a previous relationship, and the couple added a baby boy of their own in January 2019.

¶4.     Mallory began working for Trustmark National Bank as a teller in the beginning of the couple's relationship. She has remained in that position throughout the entirety of the proceedings below. Clayton currently works in the roofing industry and is part owner of a roofing business. Prior to that, he worked in the oilfields for 15 years, which required him to be gone for two weeks at a time.

¶5.     But the relationship was far from picture-perfect. Mallory would later testify that she was concerned about "little things while [they] were dating" in terms of Clayton's anger, but she had shrugged them off. But on their honeymoon, she felt "scared for [her] life." Mallory recalled how Clayton had gotten "really drunk" and "grabbed me by my hair and punched me." She was pregnant with their son Adam[1] at the time.

¶6.     And according to Mallory, the physical abuse only escalated after the honeymoon. She further testified about another incident in which Clayton "barged in" the bathroom while she was trying to seek shelter during an argument and "threw [her] up against the cabinet" one week before Adam's birth. Additionally, several photographs depicting Mallory's injuries were admitted into evidence.

---

[1] To protect the anonymity of the minor child, we use a pseudonym.

¶7. Mallory's supervisor at Trustmark, Kandis Wilkinson, corroborated much of Mallory's testimony regarding the physical abuse by Clayton. Kandis testified that she began to grow concerned in January 2019 when she noticed "bruising that [Mallory] had on her arms, legs, [and] around her neck." Kandis further disclosed that Mallory confided in her many times about the abuse by texting her pictures and calling her "between January and June after each incident."

¶8. But the abuse Mallory suffered in private burst into public one day in June 2019. Mallory, her mother, and her father all shared testimony about what happened that day. Mallory testified the couple had gotten into an argument that evening, and things escalated. Fearful, she called her parents who arrived at the couple's house shortly thereafter. She recounted that Clayton was "angry" and "raging." She further stated:

> And he said, you're not leaving with my baby. And I went and put him back. And Clay got him and pretty much said, you're not taking [Adam]. And he was shaking him, probably not meaning to just shake him, but just shook him. And I talked to him. He finally put him back in the bassinet.

¶9. Rhonda Hemphill, Mallory's mother, testified that when she and her husband arrived at the couple's house she could "hear Clay screaming." She stated that when she walked into the bedroom, Clayton was leaning over Adam's bassinet screaming, though she had "no idea what he was saying." After attempting to reason with him, Mrs. Hemphill disclosed that Clayton "picked me up by my arms and literally threw me across his bed." She testified that "his eyes were raging" and that she had "never seen anybody out of control like he was."

¶10. Then, Mallory's father, Stuart Hemphill, testified. Disclosing that "it happened very fast," he stated:

> I said, have you lost your mind? What are you doing? Don't put hands on my wife. And at that point he turned towards me. His eyes were as big as saucers. He was in his boxers. You know, it was awful. And his attention turned towards me. Rhonda got up and ran out of the room. He grabbed me and threw me up against the wall. And the wall he threw me up against was right next to the door. So I took off out the door.

After arriving at the car, Mr. Hemphill testified that his wife "was on the phone with 911."

¶11. The following morning, Mallory filed criminal domestic abuse charges against Clayton in the Lincoln County Justice Court.

¶12. In the end, Mallory left Clayton only ten months after they married.

## PROCEDURAL HISTORY

¶13. A month after the separation, Mallory filed for divorce on the statutory ground of habitual cruel and inhuman treatment, including spousal domestic abuse. A temporary hearing was held in which the chancery court addressed custody. Mallory was awarded "temporary sole physical and legal custody" of Adam, and Clayton was awarded "supervised visitation." However, the court ordered that Clayton "shall not have unsupervised visitation until such time as he completes an anger management curriculum and a mental health professional certifies to the court that he is not a danger to the child."

¶14. Ultimately Mallory withdrew her fault ground, and the parties agreed to a divorce on the ground of irreconcilable differences. A trial was set to decide custody, child support, visitation, and equitable distribution.

¶15. At the start of the proceedings, Clayton was employed with Newpark Drilling Fluids. He testified that he had worked in the oil field for approximately fifteen years, making between $10,000 and $15,000 per month. But in August 2020, Clayton was laid off from his

4

job with Newpark due to an economic downturn and received a severance package.

¶16. Clayton further disclosed that he began working with Apex Construction LLC about a month before his layoff from Newpark. Despite testifying that Apex shut down their Mississippi location, Clayton stated he was still "finishing up contracts that [he] had signed with them" as of July 2021. However, the paycheck stubs entered into evidence only showed his employment through March 2021. Unable to find work, he testified that he started his own business, Southern Comfort Roofing, in which he is a part owner. Clayton disclosed that he makes "roughly $4,000 a month before taxes" with Southern Comfort.

¶17. Both parties were required to file a Rule 8.05 financial statement.[2] Clayton filed two: his first in August 2019 and his second (updated) in August 2020. The second 8.05 represented that he made $1,500 per month.

<em>The Chancery Court's Order</em>

¶18. After conducting a thorough analysis, the chancery court found that "legal and physical custody should be awarded to Mallory," noting it reached its "decision after carefully considering the domestic violence that occurred" during the course of the couple's short marriage.

¶19. Although Clayton was awarded visitation with Adam, the chancery court restricted it to supervised and "put[] in place contingencies" which allowed "the supervision to be terminated upon Clay's fulfillments of certain requirements." The supervised restriction was to be lifted upon Clayton's "successful completion of a six[-]month course at the Mississippi

---

[2] UCCR 8.05.

Center for Violence Prevention, Batterer's Intervention Program." Clayton was also ordered to pursue the "resolution of the criminal charges [of domestic violence]." Upon written proof that both conditions were satisfied, the chancery court ordered, "the supervision requirement shall be lifted."

¶20. The chancery court then calculated Clayton's monthly child support in accordance with the guidelines set forth in Mississippi Code Annotated section 43-19-101 (Rev. 2015). Because Adam is Clayton's only child, the chancery court found Clayton was "obligated to pay 14% of his adjusted gross income as child support for the minor child." Finding Clayton's paycheck stubs from Apex Construction to be the "best evidence of Clay's gross income for child support purposes," the chancery court ordered him to pay "$723.34 per month."

¶21. Additionally, Mallory and Clayton were ordered to "share the right" in claiming Adam "on their income tax returns." Mallory would claim Adam "in odd years," and Clayton would claim Adam "in even years."

¶22. To determine an equitable distribution of the couple's marital estate, the chancery court conducted another thorough analysis. Despite receiving a severance package from his employment at Newpark, the chancery court heard "no testimony as to the duration of Clay's employment at Newpark nor as to the calculation of the severance package." Finding the funds from the severance package were marital property, the chancery court ordered the amount to "be split evenly between the parties."

¶23. We address additional facts as they become relevant.

6

**DISCUSSION**

¶24. On appeal, Clayton presents us with three assignments of error. Mallory filed a cross-appeal alleging the chancery court erred by allowing Clayton to claim Adam as a dependent for taxes every other year. We address each contention in turn.

### I. The chancery court was within its discretion to restrict and place conditions on Clayton's visitation.

¶25. Clayton argues that because he never directly harmed Adam, the chancery court abused its discretion by ordering not only that his visitation be restricted to supervised, but also in placing certain additional conditions on his visitation.

¶26. "This Court 'will not disturb a chancellor's judgment when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.'" *Rolison v. Rolison*, 105 So. 3d 1136, 1137 (¶4) (Miss. Ct. App. 2012) (quoting *Benal v. Benal*, 22 So. 3d 369, 372 (¶4) (Miss. Ct. App. 2009)).

¶27. State law empowers a chancery court to restrict visitation from "a parent who has a history of perpetrating family violence." Miss. Code Ann. § 93-5-24(9)(a)(i) (Rev. 2021). The law explains what constitutes "family violence," which can be proved "by a preponderance of the evidence" in two ways. *Id.*

¶28. First, the presumption of family violence can attach if the act "has resulted in serious bodily injury to . . . the party making the allegation or a family household member of either party." *Id.* Under the law, even just "one (1) incident of family violence" is sufficient if it resulted in serious bodily injury. *Id.* Second, family violence can be found if there is "a

7

pattern of family violence against . . . the party making the allegation or a family household member of either party." *Id.*

¶29. Once family violence has been established by a preponderance of the evidence, "there shall be a rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody or joint physical custody of a parent who has a history of perpetrating family violence." *Id.*

¶30. The statute then empowers the trial court to take a series of corrective measures "to protect the custodial parent and child[.]" Deborah H. Bell, *Bell on Mississippi Family Law* § 5.05[5] (3d ed. 2020). "The court may order exchanges in a protected setting, order supervised visitation, restrict overnight visitation, or require a bond for the child's safe return." *Id.*[3]

---

[3] The statute outlines that "a court may take any of the following actions:"

1. Order an exchange of the child to occur in a protected setting;
2. Order visitation supervised in a manner to be determined by the court;
3. Order the perpetrator of domestic or family violence to attend and complete to the satisfaction of the court a program of intervention for perpetrators or other designated counseling as a condition of visitation;
4. Order the perpetrator of domestic or family violence to abstain from possession or consumption of alcohol or controlled substances during the visitation and for twenty-four (24) hours preceding the visitation;
5. Order the perpetrator of domestic or family violence to pay a fee to defray the cost of supervised visitation;
6. Prohibit overnight visitation;
7. Require a bond from the perpetrator of domestic or family violence for the return and safety of the child; or
8. Impose any other condition that is deemed necessary to provide for the safety of the child, the victim of family or domestic violence, or other family or household member.

Miss. Code Ann. § 93-5-24(9)(d)(ii).

¶31. The chancery court made findings of fact that Clayton had committed family violence. Accordingly, his visitation with Adam was restricted, as it was not in the child's best interests. As an initial matter, visitation had to be supervised by one of Clayton's parents, who "had to be in the child's presence at all times, including overnight," and with Adam while he was being driven to visitation. If one of Clayton's parents were not available for supervised visitation, he would forfeit that period. The chancery court lifted the requirement of supervision if and when Clayton completed a six-month course at the Mississippi Center of Violence Prevention. However, the supervised visitation would continue "until the above course has been completed and the domestic violence charges [in Lincoln County Justice Court] have been resolved."

¶32. On appeal, Clayton does not contest any of the chancery court's underlying findings of fact or claim manifest error in finding he committed acts of family violence. Instead, the main thrust of his argument is that because "there were no abuse or neglect allegations pertaining to the subject minor child," the restricted visitation "is merely punitive in nature."

¶33. But the statute is not so narrow in its application. Indeed, the law is squarely focused on those in the home *other than* the children. The statute expressly applies when there is violence against either "the party making the allegation or a family household member of either party." Accordingly, we have affirmed a finding of family violence when a wife attacked her husband in the household. *Randallson v. Green*, 203 So. 3d 1190, 1197-98 (¶¶31-32) (Miss. Ct. App. 2016).

¶34. Furthermore, all the restrictions on Clayton's visitation with Adam are expressly

9

authorized or allowed by statute. *See* Miss. Code Ann. § 93-5-24(9)(d)(ii)(2) (allowing a trial court to order supervised visitation), -24(9)(d)(ii)(3) (requiring the "perpetrator of domestic or family violence to attend and complete to the satisfaction of the court a program of intervention for perpetrators or other designated counseling as a condition of visitation"), -24(9)(d)(ii)(8) ("Impose any other condition that is deemed necessary to provide for the safety of the child, the victim of family or domestic violence, or other family or household member").

¶35.    And the testimony presented at trial clearly established "a pattern of family violence" by Clayton against Mallory.  Mallory's testimony established Clayton began physically abusing her on their honeymoon when she was already pregnant with Adam.  Her supervisor at the bank testified under oath that she saw bruising and other marks on the young mother and counseled her regarding the physical attacks.  This testimony all boiled over to include Clayton's physical attacks on Mallory's mother and father during the June event which preceded her initiation of divorce proceedings.  Furthermore, and while not required to trigger the presumption in the statute, there was testimony that during his violent outburst that day he was also shaking the five-month-old infant.

¶36.    Given the volume of credible evidence of Clayton's violent acts, the chancery court was well within its authority to restrict Clayton's visitation pursuant to the statute.  In contrast, Clayton provided no evidence at all to rebut the family violence presumption.

¶37.    Clayton further argues that "the criminal matter in which [he] is the defendant has nothing to do with [his] relationship with, or actions toward, the subject minor child and

10

forcing [him] to either plea or push for disposition of said criminal matter forces [him] to either self-incriminate himself for a quick resolution or force [him] to pursue his own trial." Yet the criminal domestic-abuse charges have everything to do with Clayton's "relationship with, or actions toward, the subject minor child" as the law addresses. The statute expressly declares that "it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody or joint physical custody of a parent who has a history of perpetrating family violence." And nothing in the chancery court's order forces Clayton to admit to the charges or plead guilty. All that it required is the resolution of the domestic violence charges and proof of such resolution.

¶38. Because the chancery court's restriction is supported by substantial evidence, we find it was within the chancery court's discretion to order Clayton supervised visitation as well as place conditions on that visitation.

## II. The chancery court was within its discretion to use paycheck stubs to child support.

¶39. Clayton next argues that the chancery court abused its discretion in awarding Mallory child support "far above 14%" of his adjusted gross income. Specifically, Clayton complains about the chancery court's use of paycheck stubs from his previous employment to calculate his monthly child support.

¶40. "'[A]n award of child support is a matter within the discretion of the chancellor and . . . will not be reversed unless the chancellor was manifestly wrong in his finding of fact or manifestly abused his discretion.'" *Williamson v. Williamson*, 296 So. 3d 206, 208 (¶8) (Miss. Ct. App. 2020) (quoting *Clausel v. Clausel*, 714 So. 2d 265, 266 (¶6) (Miss. 1998)).

11

Notably, "[t]his Court limits its review of a child-support award because such an award 'is essentially an exercise in fact-finding.'" *Thomas v. Crews*, 203 So. 3d 701, 705 (¶15) (Miss. Ct. App. 2016) (quoting *Chesney v. Chesney*, 910 So. 2d 1057, 1060 (¶5) (Miss. 2005)).

¶41. Clayton and Mallory were both required to file a financial statement pursuant to Rule 8.05. *See* UCCR 8.05 (requiring each party to provide "[a] detailed written statement of actual income and expenses and assets and liabilities"). The Rule further requires parties to supplement their 8.05 "if that party knows that the disclosure, though correct when made, no longer accurately reflects any and all actual income and expenses and assets and liabilities." *Id.*

¶42. On his 8.05 financial statement, dated August 2020, Clayton disclosed that his income was $1,500 per month. But during trial in April 2021, he admitted that amount was no longer accurate since "it's all speculative," and his "pay varies check to check, week to week, whatever."

¶43. Three months later, on the last day of trial, Clayton testified that his income from his roofing business was "roughly $4,000 a month before taxes." Notably, he did not update his 8.05 financial statement to reflect his purported testimony. In fact, Clayton failed to provide any documentation whatsoever in support of his income or testimony. Indeed, in his reply brief, he admits "it is true the Appellant's 8.05 was not updated," while arguing there was other proof of his income.

¶44. In contrast to this speculative proof, the chancery court relied upon actual admitted evidence in the form of paycheck stubs from July 2020 through March 2021 from Clayton's

employment with Apex Construction. The trial court found this was the "best evidence of Clay's gross income for child support purposes."

¶45. The pay stubs displayed "an 8 month pay period with gross earnings of $57,408.16." Noting there "was no evidence presented as to [Clayton's] tax bracket," the chancery court imposed a "28% tax liability ($16,074.28)," leaving "an adjusted gross income of $41,333.88 or $5,166.74 per month (average monthly net income for 8 months)." Pursuant to the statute, the chancery court set Clayton's child support obligation for Adam "at 14% of the average monthly net income," which amounted to "$723.34 per month."

¶46. Given Clayton's failure to update his 8.05 over the 23 months since initially filing it, and given his evasive testimony regarding his finances, the chancery court was within its discretion to use the paycheck stubs to calculate his income. We have previously affirmed a chancery court's estimation of a mother's child support obligation after "the chancellor found omissions in her 8.05 financial statement as to her amount of income" after hearing her testimony. *Robinson v. Brown*, 58 So. 3d 38, 46 (¶24) (Miss. Ct. App. 2011). So using a "recent check stub" to estimate her income was reasonable. *Id.* "The record reflects the reasonableness of the chancellor's reliance upon testimony in the record, financial disclosures, and the recent check stub in his calculations." *Id.*; *see also Clark v. Clark*, 754 So. 2d 450, 459 (¶54) (Miss. 1999) (affirming award based on estimated income when "[t]he chancellor found, based on expert testimony and [husband's] own testimony, that [he] was hiding assets and income, in order to avoid financial responsibility to his children and his wife of 33 years"); *cf. Martin v. Martin*, 282 So. 3d 703, 707 (¶10) (Miss. Ct. App. 2019)

13

("Where a party fails to provide accurate information, or cooperate in the valuation of assets, the chancery court is entitled to proceed on the best information available").

¶47. It is well settled that "the process of weighing evidence and arriving at an award of child support is essentially an exercise in fact-finding, which customarily significantly restrains this Court's review." *Williamson*, 296 So. 3d at 208 (¶8). We find it was within the chancery court's discretion to use Clayton's paycheck stubs for child support calculations.

### III. The chancery court did not abuse its discretion in its classification and division of the severance package.

¶48. Clayton contends the chancery court abused its discretion in its division of the couple's marital estate. Specifically, he takes issue with the "fifty-fifty split" of his severance package, claiming that because it was nonmarital property, Mallory was "not entitled to one-half" of it.

¶49. "As it relates to the division of the marital estate, we 'review the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion.'" *Whittington v. Whittington*, 373 So. 3d 1060, 1062-63 (¶8) (Miss. Ct. App. 2023) (quoting *Wells v. Wells*, 800 So. 2d 1239, 1243 (¶8) (Miss. Ct. App. 2001)).

¶50. Our Supreme Court defines marital property "as being any and all property acquired or accumulated during the marriage." *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994). Generally speaking, "[a]ssets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside the marriage." *Id.* at 914. Importantly, "the party arguing to classify an asset as nonmarital

14

property has the burden to demonstrate to the court the asset's nonmarital character." *Wheat v. Wheat*, 37 So. 3d 632, 640 (¶26) (Miss. 2010).

¶51.    However, we have upheld a chancery court's determination that only a portion of a husband's severance package was part of the marital estate with key proof. *Prescott v. Prescott*, 736 So. 2d 409, 412 (¶10) (Miss. Ct. App. 1999). The husband in that case presented testimony by a corporate officer to explain the calculation of the severance benefit. *Id.*

¶52.    Unlike the husband in *Prescott*, Clayton failed to provide proof his severance package was nonmarital property. Clayton testified that he was terminated from Newpark in August 2020. During trial, the letter he received from the company regarding his severance package was introduced into evidence. The letter did not reference Clayton's total years of service with the company, nor did it explain the package's calculation. Likewise, Clayton failed to present any testimony or evidence to "demonstrate to the court the [severance package's] nonmarital character." *Wheat*, 37 So. 3d at 640 (¶26).

¶53.    Clayton further testified that he received the funds from his severance package about a "week or so" after his termination from the company. And although the parties' divorce proceedings had already begun, the couple did not actually divorce until September 2020.

¶54.    Because the funds from the severance package were "acquired or accumulated during the marriage," and Clayton offered no proof to rebut this presumption, we find the chancery court did not abuse its discretion in its classification and division of the package. *Hemsley*, 639 So. 2d at 915.

**IV.** **The chancery court did not abuse its discretion by allowing Clayton to claim the minor child for taxes every other year.**

¶55. Mallory raises one issue on cross-appeal: that the chancery court erred in allowing Clayton to claim their minor child as a dependent on taxes every other year.

¶56. "We review the award of tax exemptions for manifest error or abuse of discretion." *Thornton v. Thornton*, 322 So. 3d 485, 497 (¶36) (Miss. Ct. App. 2021). There are five factors that can be considered:

> (1) the value of the exemption at the marginal tax rate of each parent; (2) the income of each parent; (3) the age of the child(ren) and how long the exemption will be available; (4) the percentage of the cost of supporting the child(ren) borne by each parent; and (5) the financial burden assumed by each parent under the property settlement in the case.

*Wildman v. Wildman*, 301 So. 3d 787, 803 (¶35) (Miss. Ct. App. 2020).

¶57. In *Thornton*, the trial court had allowed only the father to claim the child; we noted that "[t]he record reflects that Tim is the only income-earning parent since Brenda is on disability and has no earned income." *Thorton*, 322 So. 3d at 497 (¶37). Accordingly, we found "the benefit of claiming [the child] as a dependent for tax purposes should be worth more to Tim" since he was also paying "a higher amount of monthly child support to Brenda[.]" *Id*.

¶58. In *Wildman*, the trial court had determined that both parents could claim a child as a dependent. *Wildman*, 301 So. 3d at 791 (¶2). The financial burdens on each parent had been thoroughly discussed in the trial court's memorandum opinion, so we determined the "decision to award each party the authorization to claim one child as a dependent does not appear to be an abuse of discretion." *Id.* at 803 (¶35).

16

¶59. We reach the same decision here. The chancery court's all-encompassing memorandum reached 61 pages, in which many factors were considered. The record shows that the couple had only one child together, Adam, who was approximately one and a half at the time of his parents' divorce. Both parents work—Mallory is a bank teller and Clayton testified he is a part-owner of a roofing business. And though Clayton has to pay child support in the amount of 14%, both parents are required to pay additional expenses for Adam.

¶60. Given that the parents divorced so early in the child's life, and that both contribute to the financial well-being of the child, we cannot say it was an abuse of discretion for the chancery court to allow Clayton to claim Adam for his taxes every other year.

## CONCLUSION

¶61. We find the chancery court was within its discretion to restrict Clayton's visitation to be supervised and place certain conditions upon it. We also find that the chancery court was within its discretion to use paycheck stubs for the purpose of determining a child support amount. Further, we find the chancery court did not abuse its discretion in its classification and division of Clayton's severance package. Finally, we find the chancery court did not abuse its discretion in allowing Clayton to claim the couple's son as a dependent every other year.

¶62. **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.**

17